# KAMEN *v.* KEMPER FINANCIAL SERVICES, INC., ET AL.

No. 90–516.   Argued March 27, 1991—Decided May 20, 1991

MARSHALL, J., delivered the opinion for a unanimous Court.

*Richard M. Meyer* argued the cause and filed briefs for petitioner.

*Michael R. Dreeben* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Roberts, James R. Doty, Paul Gonson, Jacob H. Stillman, Lucinda O. McConathy,* and *Randall W. Quinn.*

*Joan M. Hall* argued the cause for respondents. With her on the brief for respondent Kemper Financial Services, Inc., were *Barry Sullivan* and *Sidney I. Schenkier. Martin M. Ruken* and *Charles F. Custer* filed a brief for respondent Cash Equivalent Fund, Inc.*

JUSTICE MARSHALL delivered the opinion of the Court.

This case calls upon us to determine whether we should fashion a federal common law rule obliging the representative shareholder in a derivative action founded on the Investment Company Act of 1940, 54 Stat. 789, 15 U. S. C. § 80a–1(a) *et seq.,* to make a demand on the board of directors even when such a demand would be excused as futile under state law. Because the scope of the demand requirement embodies the incorporating State's allocation of governing powers within the corporation, and because a futility exception to demand does not impede the purposes of the Investment Company Act, we decline to displace state law with a uniform rule abolishing the futility exception in federal derivative actions.

---

*Briefs of *amici curiae* urging affirmance were filed for the Investment Company Institute by *Harvey L. Pitt* and *James H. Schropp;* and for the Business Roundtable by *Dennis J. Block* and *Stephen A. Radin.*

## I

The Investment Company Act of 1940 (ICA or Act) establishes a scheme designed to regulate one aspect of the management of investment companies that provide so-called "mutual fund" services. Mutual funds pool the investment assets of individual shareholders. Such funds typically are organized and underwritten by the same firm that serves as the company's "investment adviser." The ICA seeks to arrest the potential conflicts of interest inherent in such an arrangement. See generally *Daily Income Fund, Inc.* v. *Fox*, 464 U. S. 523, 536–541 (1984); *Burks* v. *Lasker*, 441 U. S. 471, 480–481 (1979). The Act requires, *inter alia*, that at least 40% of the investment company's directors be financially independent of the investment adviser, 15 U. S. C. §§ 80a–10(a), 80a–2(a)(19)(iii); that the contract between the adviser and the company be approved by a majority of the company's shareholders, § 80a–15(a); and that the dealings of the adviser with the company measure up to a fiduciary standard, the breach of which gives rise to a cause of action by either the Securities and Exchange Commission (SEC) or an individual shareholder on the company's behalf, § 80a–35(b).

Petitioner brought this suit to enforce § 20(a) of the Act, 15 U. S. C. § 80a–20(a), which prohibits materially misleading proxy statements.[1] The complaint was styled as a share-

---

[1] Section 20(a) states:

"It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U. S. C. § 80a–20(a).

SEC regulations require proxy statements issued by a registered investment company to comply with the proxy statement rules promulgated under the Securities Exchange Act of 1934. See 17 CFR § 270.20a–1(a)

holder derivative action brought on behalf of respondent Cash Equivalent Fund, Inc. (Fund), a registered investment company, against Kemper Financial Services, Inc. (KFS), the Fund's investment adviser. Petitioner alleged that KFS obtained shareholder approval of the investment-adviser contract by causing the Fund to issue a proxy statement that materially misrepresented the character of KFS' fees. See App. to Pet. for Cert. 90a–91a. Petitioner also averred that she made no precomplaint demand on the Fund's board of directors because doing so would have been futile. In support of this allegation, the complaint stated that all of the directors were under the control of KFS, that the board had voted unanimously to approve the offending proxy statement, and that the board had subsequently evidenced its hostility to petitioner's claim by moving to dismiss. See *id.*, at 92a–93a. The District Court granted KFS' motion to dismiss on the ground that petitioner had failed to plead the facts excusing demand with sufficient particularity for purposes of Federal Rule of Civil Procedure 23.1. See 659 F. Supp. 1153, 1160–1163 (ND Ill. 1987).

The Court of Appeals affirmed the dismissal of petitioner's § 20(a) claim. See 908 F. 2d 1338 (CA7 1990). Like the District Court, the Court of Appeals concluded that petitioner's failure to make a precomplaint demand was fatal to her case. Drawing heavily on the American Law Institute's Principles of Corporate Governance (Tent. Draft No. 8, Apr. 15, 1988), the Court of Appeals concluded that the futility exception does little more than generate wasteful threshold litigation collateral to the merits of the derivative shareholder's claim. For that reason, the court adopted as a rule of federal common law the ALI's so-called "universal demand" rule, under which the futility exception is abolished. See 908 F. 2d, at 1344; see also ALI, Principles of Corporate Governance,

---

(1990). The latter rules prohibit materially misleading statements. See § 240.14a–9.

*supra,* §§ 7.03(a)–(b), and comment *a.*[2]  The court acknowl-
edged this Court's precedents holding that courts should in-
corporate state law when fashioning federal common law
rules to fill the interstices of private causes of action brought
under federal securities laws.  See 908 F. 2d, at 1342.
Nonetheless, because petitioner had neglected until her reply
brief to advert to the established status of the futility excep-
tion under the law of Maryland—the State in which the Fund
is incorporated—the court held that petitioner's challenge to
the court's power to adopt the ALI's universal-demand rule
"c[ame] too late" to be considered.  *Ibid.*[3]

We granted certiorari, 498 U. S. 997 (1990), and now
reverse.

## II

The derivative form of action permits an individual share-
holder to bring "suit to enforce a *corporate* cause of action
against officers, directors, and third parties."  *Ross* v. *Bern-
hard,* 396 U. S. 531, 534 (1970).  Devised as a suit in equity,
the purpose of the derivative action was to place in the hands
of the individual shareholder a means to protect the inter-
ests of the corporation from the misfeasance and malfeasance
of "faithless directors and managers."  *Cohen* v. *Beneficial
Loan Corp.,* 337 U. S. 541, 548 (1949).  To prevent abuse of

---

[2] The ALI's proposal would excuse demand "only when the plaintiff
makes a specific showing that irreparable injury to the corporation would
otherwise result."  Principles of Corporate Governance § 7.03(b).  The
Court of Appeals did not specifically address this aspect of the ALI's pro-
posal, although the court did reject the possibility that "exigencies of time"
would warrant dispensing with demand.  908 F. 2d, at 1344.

[3] The Court of Appeals also reversed the District Court's conclusion
that petitioner could not sue under § 36(b) of the Act, 15 U. S. C. § 80a–
35(b), because she was not an adequate shareholder representative under
Rule 23.1.  See 908 F. 2d, at 1347–1349.  After holding that petitioner
was not entitled to a jury trial, the Court of Appeals remanded for further
proceedings on petitioner's § 36(b) claim.  See *id.,* at 1350–1351.  No as-
pect of the Court of Appeals' disposition of petitioner's § 36(b) claim is
before this Court.

this remedy, however, equity courts established as a "precondition for the suit" that the shareholder demonstrate that "the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." *Ross v. Bernhard, supra,* at 534. This requirement is accommodated by Federal Rule of Civil Procedure 23.1, which states in pertinent part:

> "The complaint [in a shareholder derivative action] shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

But although Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, it does not *create* a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings. Indeed, as a rule of procedure issued pursuant to the Rules Enabling Act, Rule 23.1 cannot be understood to "abridge, enlarge or modify any substantive right." 28 U. S. C. § 2072(b). The purpose of the demand requirement is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and 'waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" *Daily Income Fund, Inc.* v. *Fox,* 464 U. S., at 533, quoting *Corbus* v. *Alaska Treadwell Gold Mining Co.,* 187 U. S. 455, 463 (1903). Ordinarily, it is only when demand is excused that the shareholder enjoys the right to initiate "suit on behalf of his corporation in disregard of the directors' wishes." R. Clark, Corporate Law § 15.2, p. 640 (1986). In our view, the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance," not

"procedure." See *Daily Income Fund, Inc.* v. *Fox, supra,* at 543–544, and n. 2 (STEVENS, J., concurring in judgment); cf. *Cohen* v. *Beneficial Loan Corp., supra,* at 555–557 (state security-for-costs statute limits shareholder's "substantive" right to maintain derivative action); *Hanna* v. *Plumer,* 380 U. S. 460, 477 (1965) (Harlan, J., concurring) (rule is "substantive" when it regulates derivative shareholder's primary conduct in exercise of corporate managerial power). Thus, in order to determine whether the demand requirement may be excused by futility in a derivative action founded on § 20(a) of the ICA,[4] we must identify the source and content of the substantive law that defines the demand requirement in such a suit.

### III

### A

It is clear that the contours of the demand requirement in a derivative action founded on the ICA are governed by *federal* law. Because the ICA is a federal statute, any common law rule necessary to effectuate a private cause of action under that statute is necessarily federal in character. See *Burks* v. *Lasker,* 441 U. S., at 476–477; *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173, 176 (1942).

---

[4] We have never addressed the question whether § 20(a) creates a shareholder cause of action, either direct or derivative. The SEC, as *amicus curiae,* urges us to hold that a shareholder may bring suit under § 20(a) but only on his own behalf. The parties did not litigate this question in the Court of Appeals, and because that court disposed of petitioner's claim on different grounds, it declined to address whether § 20(a) creates a derivative action. See 908 F. 2d 1338, 1341 (CA7 1990). The petition for certiorari likewise did not raise this issue in the questions presented. Because the question whether § 20(a) supports a derivative action is not jurisdictional, see *Burks* v. *Lasker,* 441 U. S. 471, 476, n. 5 (1979), and because we do not ordinarily address issues raised only by *amici,* see, *e. g., United Parcel Service, Inc.* v. *Mitchell,* 451 U. S. 56, 60, n. 2 (1981), we leave this question for another day. See *Burks* v. *Lasker, supra,* at 475–476 (assuming existence of derivative action under ICA for purposes of determining power of independent directors to terminate suit).

It does not follow, however, that the content of such a rule must be wholly the product of a federal court's own devising. Our cases indicate that a court should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards, see, *e. g.*, *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 366–367 (1943), or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand, see, *e. g.*, *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 511–512 (1988); *DelCostello* v. *Teamsters*, 462 U. S. 151, 169–172 (1983). Otherwise, we have indicated that federal courts should "incorporat[e] [state law] as the federal rule of decision," unless "application of [the particular] state law [in question] would frustrate specific objectives of the federal programs." *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 728 (1979). The presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards. See *id.*, at 728–729, 739–740 (commercial law); *Reconstruction Finance Corp.* v. *Beaver County*, 328 U. S. 204, 210 (1946) (property law); see also *De Sylva* v. *Ballentine*, 351 U. S. 570, 580–581 (1956) (borrowing family law because of primary state responsibility).

Corporation law is one such area. See *Burks* v. *Lasker, supra.* The issue in *Burks* was whether the disinterested directors of a registered investment company possess the power to terminate a nonfrivolous derivative action founded on the ICA and the Investment Advisers Act of 1940 (IAA). We held that a federal court should look to state law to answer this question. See *id.*, at 477–485. "'Corporations,'" we emphasized, "'are creatures of state law,' . . . and it is

state law which is the font of corporate directors' powers."
*Id.*, at 478, quoting *Cort* v. *Ash,* 422 U. S. 66, 84 (1975). We
discerned nothing in the limited regulatory objectives of the
ICA or IAA that evidenced a congressional intent that "fed-
eral courts . . . fashion an entire body of federal corporate
law out of whole cloth." 441 U. S., at 480. Consequently,
we concluded that gaps in these statutes bearing on the allo-
cation of governing power within the corporation should be
filled with state law "unless the state la[w] permit[s] action
prohibited by the Acts, or unless '[its] application would be
inconsistent with the federal policy underlying the cause of
action . . . .'" *Id.*, at 479, quoting *Johnson* v. *Railway Ex-
press Agency, Inc.,* 421 U. S. 454, 465 (1975).

Defending the reasoning of the Court of Appeals, KFS ar-
gues that petitioner waived her right to the application of
anything other than a uniform federal rule of demand because
she failed to advert to state law until her reply brief in the
proceedings below. We disagree. When an issue or claim is
properly before the court, the court is not limited to the par-
ticular legal theories advanced by the parties, but rather re-
tains the independent power to identify and apply the proper
construction of governing law. See, *e. g., Arcadia* v. *Ohio
Power Co.,* 498 U. S. 73, 77 (1990). It is not disputed
that petitioner effectively invoked federal common law as the
basis of her right to forgo demand as futile. Having under-
taken to decide this claim, the Court of Appeals was not free
to promulgate a federal common law demand rule without
identifying the proper *source* of federal common law in this
area. Cf. *Lamar* v. *Micou,* 114 U. S. 218, 223 (1885) ("The
law of any State of the Union, whether depending upon stat-
utes or upon judicial opinions, is a matter of which the courts
of the United States are bound to take judicial notice, with-
out plea or proof"); *Bowen* v. *Johnston,* 306 U. S. 19, 23
(1939) (same). Indeed, we note that the Court of Appeals

viewed itself as free to adopt the American Law Institute's universal-demand rule even though *neither* party addressed whether the futility exception should be abolished as a matter of federal common law.[5]

The question, then, is whether the Court of Appeals drew its universal-demand rule from an improper source when it disregarded state law relating to the futility exception. To answer that question, we must first determine whether the demand requirement comes within the purview of *Burks'* presumption of state-law incorporation, that is, whether the scope of the demand requirement affects the allocation of governing power within the corporation. If so, we must then determine whether a futility exception to the demand requirement impedes the policies underlying the ICA.[6]

---

[5] We do not mean to suggest that a court of appeals should not treat an unasserted claim as waived or that the court has no discretion to deny a party the benefit of favorable legal authorities when the party fails to comply with reasonable local rules on the timely presentation of arguments. See generally *Singleton* v. *Wulff*, 428 U. S. 106, 121 (1976). Nonetheless, if a court undertakes to sanction a litigant by deciding an effectively raised claim according to a truncated body of law, the court should refrain from issuing an opinion that could reasonably be understood by lower courts and nonparties to establish binding circuit precedent on the issue decided.

[6] KFS argues that *Burks* is not controlling because this Court established a uniform, federal common law demand requirement in *Hawes* v. *Oakland*, 104 U. S. 450 (1882). This contention is unpersuasive. In *Hawes*, this Court articulated a demand requirement (along with a futility exception) to protect the managerial prerogatives of the corporate directors and to prevent the collusive manufacture of diversity jurisdiction. See *id.*, at 460–461. The latter objective, which is clearly a proper aim of federal law, is now governed not by a federal common law doctrine of demand but rather by the express terms of Federal Rule of Civil Procedure 23.1, which requires the plaintiff to allege that "the action is not a collusive one to confer jurisdiction on a court of the United States." See also *Smith* v. *Sperling*, 354 U. S. 91, 95–98 (1957) (district court should look to "face of the pleadings and [to] nature of the controversy" to resolve jurisdictional issues in derivative action founded on diversity). Insofar as *Hawes* aspired to regulate the substantive managerial prerogatives of directors in a derivative action founded on diversity of citizenship, the demand rule es-

## B

Because the contours of the demand requirement—when it is required, and when excused—determine *who* has the power to control corporate litigation, we have little trouble concluding that this aspect of state law relates to the allocation of governing powers within the corporation. The purpose of requiring a precomplaint demand is to protect the directors' prerogative to take over the litigation or to oppose it. See, *e. g.*, *Spiegel* v. *Buntrock*, 571 A. 2d 767, 773 (Del. 1990). In most jurisdictions, the board's decision to do the former ends the shareholder's control of the suit, see R. Clark, Corporate Law § 15.2, p. 640 (1986), while its decision to do the latter is subject only to the deferential "business judgment rule" standard of review, see, *e. g.*, *Zapata Corp.* v. *Maldonado*, 430 A. 2d 779, 784, and n. 10 (Del. 1981). Thus, the demand requirement implements "the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Daily Income Fund, Inc.* v. *Fox*, 464 U. S., at 530.

To the extent that a jurisdiction recognizes the futility exception to demand, the jurisdiction places a *limit* upon the directors' usual power to control the initiation of corporate litigation. Although "jurisdictions differ widely in defining

---

tablished in that case does not survive *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938). Cf. *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541, 555–557 (1949) (federal court sitting in diversity must apply state security-for-costs statute in derivative action). Of course, the principles recognized in *Erie* place no limit on a federal court's power to fashion federal common law rules necessary to effectuate a derivative remedy founded on federal law. See *Burks* v. *Lasker*, 441 U. S., at 476. But in this respect, whatever philosophy of federal common lawmaking can be gleaned from *Hawes* has been eclipsed by the philosophy of *Burks*. In sum, *Hawes* is irrelevant to our disposition of this case.

the circumstances under which demand on directors will be excused," D. DeMott, Shareholder Derivative Actions § 5:03, p. 35 (1987), demand typically is deemed to be futile when a majority of the directors have participated in or approved the alleged wrongdoing, see, e. g., *Barr* v. *Wackman*, 36 N. Y. 2d 371, 381, 329 N. E. 2d 180, 188 (1975), or are otherwise financially interested in the challenged transactions, see, e. g., *Aronson* v. *Lewis*, 473 A. 2d 805, 814 (Del. 1984).[7] By permitting the shareholder to circumvent the board's business judgment on the desirability of corporate litigation, the "futility" exception defines the circumstances in which the shareholder may exercise this particular incident of managerial authority. See, e. g., *Zapata Corp.* v. *Maldonado*, *supra*, at 784.

The futility exception to the demand requirement may also determine the scope of the directors' power to terminate derivative litigation once initiated—the very aspect of state corporation law that we were concerned with in *Burks*. In many (but not all) States, the board may delegate to a committee of disinterested directors the board's power to control corporate litigation. See generally R. Clark, *supra*, § 15.2.3. Some of these jurisdictions treat the decision of a special litigation committee to terminate a derivative suit as automatically entitled to deference under the "business judgment rule." See, e. g., *Auerbach* v. *Bennett*, 47 N. Y. 2d 619, 631–633, 393 N. E. 2d 994, 1001–1002 (1979). Others, including Delaware, defer to the decision of a special litigation committee only in a "demand required" case; in a "demand excused" case, these States first require the court to confirm the "independence, good faith and . . . reasonable

---

[7] All States require that a shareholder make a precomplaint demand on the directors. See D. DeMott, Shareholder Derivative Actions § 5:03, p. 23 (1987); *id.*, at 65, n. 1 (Supp. 1990). Only a few States, however, have adopted a universal-demand rule. See Fla. Stat. Ann. § 607.07401(2) (Supp. 1991); Ga. Code Ann. § 14–2–742 (1989); Mich. Comp. Laws Ann. § 450.1493a(a) (1990).

investigat[ory]" efforts of the committee and then authorize the court to exercise its "own independent business judgment" in assessing whether to enforce the committee's recommendation, *Zapata Corp.* v. *Maldonado, supra,* at 788–789; see *Spiegel* v. *Buntrock, supra,* at 778. Thus, in these jurisdictions, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Aronson* v. *Lewis, supra,* at 812.

Superimposing a rule of universal-demand over the corporate doctrine of these States would clearly upset the balance that they have struck between the power of the individual shareholder and the power of the directors to control corporate litigation. Under the law of Delaware and the States that follow its lead, a shareholder who makes demand may not later assert that demand was in fact excused as futile. *Spiegel* v. *Buntrock,* 571 A. 2d, at 775. Once a demand has been made, the decision to block or to terminate the litigation rests solely on the business judgment of the directors. See *ibid.* Thus, by taking away the shareholder's right to withhold demand under the circumstances where demand is deemed to be futile under state law, a universal-demand rule, in direct contravention of the teachings of *Burks,* would *enlarge* the power of directors to control corporate litigation. See 441 U. S., at 478–479.

KFS contends that the scope of a federal common law demand requirement need not be tied to the allocation of power to control corporate litigation. This is so, KFS suggests, because a court adjudicating a derivative action based on federal law could sever the requirement of shareholder demand from the standard used to review the directors' decision to bar initiation of, or to terminate, the litigation. Drawing on the ALI's Principles of Corporate Governance, the Court of Appeals came to this same conclusion. See 908 F. 2d, at 1343–1344. Freed from the question of the directors' power to control the litigation, the universal-demand requirement,

KFS maintains, would force would-be derivative suit plaintiffs to exhaust their intracorporate remedies before filing suit and would spare both the courts and the parties the expense associated with the often protracted threshold litigation that attends the collateral issue of demand futility.

We reject this analysis. Whatever its merits as a matter of legal reform, we believe that KFS' proposal to detach the demand standard from the standard for reviewing board action would require a quantum of federal common lawmaking that exceeds federal courts' interstitial mandate. Under state law, the determination whether a derivative representative can initiate a suit without making demand typically is made at the outset of the litigation and is based on the application of the State's futility doctrine to circumstances as they then exist. D. DeMott, *supra*, § 5:03, at 31. Under KFS' proposal, federal courts would be obliged to develop a body of principles that would replicate the substantive effect of the State's demand futility doctrine but that would be applied *after* demand has been made and refused. The ALI, for example, has developed an elaborate set of standards that calibrates the deference afforded the decision of the directors to the character of the claim being asserted by the derivative plaintiff. See ALI, Principles of Corporate Governance § 7.08 (Tent. Draft No. 8, Apr. 15, 1988); *id.*, § 7.08, Comment *c*, p. 120 (noting that Principles "dra[w] a basic distinction between the standard of review applicable to actions that are founded on a breach of the duty of care and the standard of review applicable to actions that are founded on a breach of the duty of loyalty").[8] Whether a federal court adopts

---

[8] The American Bar Association's Model Business Corporation Act likewise abolishes the futility exception to demand. See Model Business Corporation Act § 7.42(1), reprinted in 45 Bus. Law. 1241, 1244 (1990). And like the ALI's Principles of Corporate Governance, the Model Business Corporation Act spells out a detailed set of principles for identifying the circumstances in which the decision of the directors is entitled to deference. Model Business Corporation Act § 7.44, reprinted in 45 Bus. Law., at 1246–1247. The official commentary acknowledges that these review

the ALI's standards wholesale or instead attempts to devise postdemand review standards more finely tuned to the distinctive allocation of managerial decisionmaking power embodied in any given jurisdiction's demand futility doctrine, KFS' suggestion would impose upon federal courts the very duty "to fashion an entire body of federal corporate law" that *Burks* sought to avoid. 441 U. S., at 480.

Such a project, moreover, would necessarily infuse corporate decisionmaking with uncertainty. For example, insofar as Delaware law does not permit a shareholder to make a demand and later to assert its futility, receipt of demand makes it crystal clear to the directors of a Delaware corporation that the decision whether to commit the corporation to litigation lies solely in their discretion. See *Spiegel* v. *Buntrock, supra,* at 775. Were we to impose a universal-demand rule, however, the directors of such a corporation could draw no such inference from receipt of demand by a shareholder contemplating a federal derivative action. Because the entitlement of the directors' decision to deference in such a case would depend on the court's application of independent review standards somewhere down the road, the directors could do no more than speculate as to whether they should assess the merits of the demand themselves or instead incur the time and expense associated with forming a special litigation committee; indeed, at that stage, even the deference due the decision of such a committee would be unclear. The directors' dilemma would be especially acute if the shareholder were proposing to join state-law and federal claims, see *RCM Securities Fund, Inc.* v. *Stanton,* 928 F. 2d 1318, 1327–1328 (CA2 1991), a common form of action in federal derivative practice, see D. DeMott, Shareholder Derivative Actions

standards "diffe[r] in certain . . . respects from the law as it has developed in Delaware and been followed in a number of other states." § 7.44, *Official Comment,* reprinted in 45 Bus. Law., at 1250.

§ 4:08, 71 (1987).[9] It is to avoid precisely this type of disruption to the internal affairs of the corporation that *Burks* counsels against establishing competing federal- and state-law principles on the allocation of managerial prerogatives within the corporation. See generally Restatement (Second) of Conflict of Laws § 302, Comment *e*, p. 309 (1971) ("Uniform treatment of directors, officers and shareholders is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law").

Finally, in our view, KFS overstates the likely judicial economies associated with a federal universal-demand rule when coupled with independent standards of review. Requiring demand in all cases, it is true, might marginally enhance the prospect that corporate disputes would be resolved without resort to litigation; however, nothing disables the directors from seeking an accommodation with a representative shareholder even after the shareholder files his complaint in an action in which demand is excused as futile. At the same time, the rule proposed by KFS is unlikely to avoid the high collateral litigation costs associated with the demand futility doctrine. So long as a federal court endeavors to reproduce through independent review standards the allocation of managerial power embodied in the demand futility doctrine, KFS' universal-demand rule will merely *shift the focus* of threshold litigation from the question whether demand is excused to the question whether the directors' decision to terminate the suit is entitled to deference under federal standards. Under these circumstances, we do not view the advantages associated with KFS' proposal to be sufficiently

---

[9] Indeed, because "[i]n most instances, the shareholder need not specify his legal theory" in his demand, *Allison* v. *General Motors Corp.*, 604 F. Supp. 1106, 1117 (Del. 1985), aff'd, 782 F. 2d 1026 (CA3 1985), the directors frequently will not be able to tell whether the underlying claim is founded on state law or on federal law. This uncertainty will further complicate managerial decisionmaking.

apparent to justify replacing "the entire corpus of state corporation law" relating to demand futility. See *Burks* v. *Lasker*, 441 U. S., at 478.

C

We would nonetheless be constrained to displace state law in this area were we to conclude that the futility exception to the demand requirement is inconsistent with the policies underlying the ICA. See *id.*, at 479–480. KFS contends that the futility exception does impede the regulatory objectives of the statute. As KFS notes, the requirement that at least 40% of the board of directors be financially independent of the investment adviser constitutes "[t]he cornerstone of the ICA's effort to control conflicts of interest within mutual funds." *Id.*, at 482. KFS argues that the futility exception undermines the "watchdog" role assigned to the independent directors, see *id.*, at 484–485, because empowering a shareholder to institute corporate litigation without the permission of the board allows the shareholder to "usurp" the independent directors' managerial oversight responsibility. See Brief for Respondent KFS 40.

We disagree. KFS' argument misconceives the means by which Congress intended independent directors to exercise their oversight function under the ICA. As we emphasized in *Burks*, the ICA embodies a congressional expectation that the independent directors would "loo[k] after the interests of the [investment company]" by "exercising the authority granted to them *by state law.*" 441 U. S., at 485 (emphasis added). Indeed, we specifically noted in *Burks* that "[t]he ICA does not purport to be the source of authority for managerial power; rather the Act functions primarily to 'impos[e] *controls and restrictions* on the internal management of investment companies.'" *Id.*, at 478, quoting *United States* v. *National Assn. of Securities Dealers, Inc.*, 422 U. S. 694, 705 n. 13 (1975) (emphasis added by *Burks* Court). We thus discern no policy in the Act that would require us to give the independent directors, or the boards of investment compa-

nies as a whole, *greater* power to block shareholder derivative litigation than these actors possess under the law of the State of incorporation.

KFS also ignores the role that the ICA clearly envisions for shareholders in protecting investment companies from conflicts of interest. As we have pointed out, § 36(b) of the ICA expressly provides that an individual shareholder may bring an action on behalf of the investment company for breach of the investment adviser's fiduciary duty. 15 U. S. C. § 80a–35(b). Congress added § 36(b) to the ICA in 1970 because it concluded that the shareholders should not have to "rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board." *Daily Income Fund, Inc.* v. *Fox*, 464 U. S., at 540. This legislative background informed our conclusion in *Fox* that a shareholder action "on behalf of" the company under § 36(b) is direct rather than derivative and can therefore be maintained without *any* precomplaint demand on the directors. Under these circumstances, it can hardly be maintained that a shareholder's exercise of his state-created prerogative to initiate a derivative suit without the consent of the directors frustrates the broader policy objectives of the ICA.

## IV

We reaffirm the basic teaching of *Burks* v. *Lasker, supra:* where a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate *state* law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute. The scope of the demand requirement under state law clearly regulates the allocation of corporate governing powers between the directors and individual shareholders. Because a futility exception to demand does not impede the regulatory objectives of the ICA, a court that is entertaining a derivative action under that statute must apply the

demand futility exception as it is defined by the law of the State of incorporation. The Court of Appeals thus erred by fashioning a uniform federal common law rule abolishing the futility exception in derivative actions founded on the ICA.[10]

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[10] KFS maintains that we should nonetheless affirm the dismissal of petitioner's cause of action because petitioner did not plead the grounds excusing demand with sufficient particularity for purposes of Federal Rule of Civil Procedure 23.1. Because the Court of Appeals applied a universal-demand rule, it never addressed the sufficiency of petitioner's complaint with reference to the futility exception as defined by the law of Maryland, the State in which the Fund is incorporated. Rather than take the issue up for the first time ourselves, we leave for the Court of Appeals on remand the question whether petitioner adequately pleaded excuse of demand for purposes of Rule 23.1.