**UNITED STATES of America, Plaintiff,**

v.

**Jeffrey E. EPSTEIN, Ivan S. Fisher, Ellyn Bank, Debra Elisa Cohen, Diane Fisher d/b/a the Fisher Group, Fisher & Soffer a/k/a Fisher & Sophir, Lawrence D. Gerzog, Robert Heilbrun, Suzanne McDermott, Christopher H. Martin, Jesse Siegel a/k/a Jessie Siegel, Siegel, Martin & Heilbrun, Ron Soffer, and Carmen Tausik, Defendants.**

No. 96 CIV. 8307(DC).

United States District Court,
S.D. New York.

March 31, 1998.

Mary Jo White, United States Attorney, by Serene K. Nakano, Assistant United States Attorney, New York City, for the United States.

Wachtel & Masyr, LLP, by Steven J. Cohen, New York City, for Jeffrey E. Epstein.

Gage & Pavlis, by G. Robert Gage, Jr., Ellen J. Casey, New York City, for Ivan S. Fisher, Diane Fisher, Fisher & Soffer.

Ellyn Bank, New York City, pro se.

Debra Elisa Cohen, New York City, pro se.

Lawrence D. Gerzog, New York City, pro se.

Robert Heilbrun, New York City, pro se.

Suzanne McDermott, New York City, pro se.

Christopher H. Martin, New York Defenders Service, New York City, pro se.

Jessie Siegel, New York City, pro se.

Siegel, Martin & Heilbrun, by Robert Heilbrun, New York City, pro se.

Ron Soffer, New York City, pro se.

Carmen Tausik, New York City, pro se.

### OPINION

CHIN, District Judge.

In this case, the United States (the "Government") seeks to evict defendants from a building formerly used as a residence by the Deputy Consul General of the Islamic Republic of Iran ("Iran"). After diplomatic and consular relations with Iran were severed in 1980, the Office of Foreign Missions ("OFM") of the United States Department of State took possession of the building pursuant to the Foreign Missions Act, 22 U.S.C. § 4301 *et seq.* OFM leased the building to defendant Jeffrey E. Epstein in 1992. Epstein sublet the building to defendant Ivan S. Fisher in 1996, purportedly without the Government's consent. Fisher, in turn, sublet a portion of the building to several subtenants.

In 1996, the Government purported to terminate Epstein's lease and brought this action to eject Epstein and Fisher from the building. The Government later amended its complaint to assert a claim for ejectment against the subtenants as well.[1] The Government also sought to recover back rent from Epstein and Fisher.

Epstein and Fisher oppose ejectment on numerous grounds, some of which were rejected when I heard oral argument in this case on December 17, 1997. Defendants' sole remaining defenses are that (1) OFM orally consented to Epstein's proposed sublet of the premises to Fisher, and (2) OFM did not properly terminate Epstein's lease be-

---

1. The additional defendants are Ellyn Bank, Debra Elisa Cohen, Diane Fisher d/b/a The Fisher Group, Fisher & Soffer a/k/a Fisher & Sophir, Lawrence D. Gerzog, Robert Heilbrun, Suzanne McDermott, Christopher H. Martin, Jesse Siegel a/k/a Jessie Siegel, Siegel, Martin & Heilbrun, Ron Soffer, and Carmen Tausik (collectively, the "Subtenants"). The Subtenants were added as defendants after the Government learned that Fisher had sublet to them without consent of OFM.

cause it breached an implied covenant of good faith and fair dealing by unreasonably withholding written consent to Epstein's request to sublet to Fisher.

Because I find as a matter of law that (1) the lease unambiguously required the prior written consent of OFM for Epstein to sublet or assign the premises, thereby rendering any alleged oral consent invalid, and (2) OFM was entitled under the lease to unreasonably withhold its written consent to Epstein's request to sublet to Fisher, the Government's motion for partial summary judgment on its claim for ejectment is granted as against all defendants.

## BACKGROUND

### A. The Facts

The premises at 34 East 69th Street in Manhattan (the "Premises") were once the residence of the former Deputy General Consul of Iran. When the United States severed diplomatic ties with Iran in 1980, the Deputy General Consul vacated, but the Premises remained the property of Iran. The Government, through the Secretary of State, was entrusted with the care and maintenance of the Premises under the Foreign Missions Act ("FMA"), 22 U.S.C. § 4305(c), and the Vienna Convention on Consular Relations, Apr. 24, 1963, art. 27(1)(a), 21 U.S.T. 77, 596 U.N.T.S. 261, a multilateral treaty entered into by the United States and Iran, among other nations.

In 1992, OFM entered into a two-year lease with Epstein, to run from February 1, 1992 through January 31, 1994. The agreed rent was $15,000 per month. Pursuant to the lease's Use Clause, only Epstein, his family, servants, or approved subtenants or assignees could occupy the premises. Under the Assignment and Sublease Clause, Epstein was required to obtain prior written consent of OFM to assign or sublet the Premises. The lease contained no clause prohibiting OFM from unreasonably withholding its consent to a sublet or assignment.

On August 28, 1992, OFM and Epstein extended the lease for three more years, to January 31, 1997. The lease amendment did not alter either the Use Clause or the Assignment and Sublease Clause. Epstein was granted, however, a right of first refusal to renew the lease upon its expiration at the end of January, 1997.

Epstein and his family continued to reside at the Premises until January of 1996, at which time Epstein abandoned. OFM did not discover that Epstein had abandoned the Premises, however, until several months later. In March of 1996, Epstein commenced negotiations with Xenophon Galinas for a possible sublease or assignment of the Premises. The proposed arrangement between Epstein and Galinas included payment by Galinas to Epstein of $100,000 for improvements to the Premises made by Epstein during his tenancy. At the same time, Epstein also commenced negotiations to sublet the Premises to Fisher. Fisher informed Epstein, however, that he would not enter into a sublease unless it was approved by the State Department and Fisher could be assured that he could remain in the Premises beyond January 31, 1997. Epstein told Fisher that he had a right of first refusal under the lease amendment, and that pursuant to this right, he would take all necessary steps to renew at the end of the lease term.

In the meantime, Galinas contacted OFM directly about a new lease for the Premises beginning in February of 1997. Negotiations between Galinas and OFM culminated in a "letter agreement" dated April 12, 1996 by which Galinas agreed to rent the Premises for a five-year term beginning February 1, 1997 for $16,000 per month, with yearly increases, up to $18,000 per month for the last year of the lease term. This agreement was expressly made subject to Epstein exercising his right of first refusal and renewing his lease for personal use only. In other words, OFM told Galinas that it would not consent to any request by Epstein for a sublet beyond January 31, 1997, and that it would permit Epstein to renew the lease beyond that date only if he occupied the premises personally.

On April 16, 1996, Epstein notified OFM by letter that he intended to exercise his right of first refusal and renew the lease. Epstein contends that in a telephone conference between Richard Massey of OFM and

Jeffrey Schantz, Epstein's transaction counsel, on April 19, 1996, OFM orally consented to Epstein's request to sublet the Premises to Fisher. The same day, Epstein wrote back, requesting "written confirmation" of OFM's alleged approval. By letter dated April 26, 1996, OFM formally responded to Epstein's request. In this letter, Thomas E. Burns, a representative of OFM, informed Epstein of OFM's intention to lease the Premises to Galinas beginning February 1, 1997 in the event that Epstein decided not to renew the lease and occupy the premises personally, and denied Epstein's request to sublet the Premises to Fisher. OFM's stated reasons for the denial were to (1) "minimize any difficulties in turning over the house to the tenant we have selected should Mr. Epstein decide not to reoccupy the premises under the new lease," and (2) "minimize the potential for damage to the premises from a short-term tenant occupancy." (Schantz Aff., Exh. D). OFM did, however, grant Epstein permission to sublet the Premises to Galinas for the remainder of 1996.

On May 3, 1996, Epstein again wrote to OFM, formally exercising his right of first refusal, believing such right to have been triggered by the April 12, 1996 letter agreement between OFM and Galinas. Thereafter, on May 7, 1996, Epstein and Fisher entered into a sublease agreement at a rental price of $20,000 per month, despite OFM's express denial of Epstein's request for permission to sublet to Fisher. Fisher claims to have entered into the sublease agreement based on Epstein's representations that the sublease was approved by the State Department and that Epstein had properly exercised his right of first refusal to renew the lease. The original sublease was to commence May 7, 1996 and terminate on January 31, 1997. In the event that Epstein's lease with OFM was extended, and the new rent under that lease did not exceed $20,000 per month, the sublease would be automatically extended for an additional five-year period.

On May 8, 1996, OFM wrote to Epstein informing him that his attempt to exercise his right of first refusal was premature because OFM had not yet made a formal offer to lease the Premises to someone else. On May 10, 1996, OFM again wrote to Epstein reiterating that the exercise of his right of first refusal was premature, and explaining that the prior arrangement with Galinas was not a binding contract, but rather merely an "expression of interest." Then, on May 16, 1996, OFM officials visited the Premises and discovered that Fisher, not Epstein, was in possession.

Throughout this period, Epstein continued to pay, and OFM continued to accept, rent for the Premises, despite its knowledge that Fisher was in possession. OFM accepted and deposited Epstein's May 1996 rent check on May 28, 1996. On June 3, 1996, OFM sent Epstein a notice of default, as required by the lease, stating that he was in violation of (1) the Use Clause, because he was no longer personally occupying the premises, and (2) the Assignment and Sublease Clause, because he had sublet to Fisher without prior written consent of OFM. Consistent with the terms of the Lease, Epstein was given 30 days to cure the default. On June 28, 1996, OFM accepted Epstein's June rent check. The cure period then expired on July 10, 1996. Epstein had not cured by this time, but rather than terminating the lease, OFM served Epstein with a 10-day notice to cure and demanded the July rent. OFM then accepted Epstein's check for the July rent. Finally, on August 7, 1996, OFM notified Epstein that the amended lease would be terminated as of August 23, 1996 for failure to cure the defaults. OFM demanded that Epstein vacate the Premises and return the keys on or before that date.

Despite OFM's notice of termination, Epstein tendered August rent on August 30, 1996. On September 13, 1996, OFM wrote to Epstein stating that rent was being accepted only through August 23, 1996, and refunded the balance to Epstein. On September 16, 1996, OFM wrote to Fisher advising that the lease agreement between OFM and Epstein had been terminated, that he was occupying the premises illegally, and demanded that the Premises be vacated immediately. Fisher met with an Assistant United States Attorney on September 23, 1996, who informed Fisher that Richard Massey, the OFM representative with whom Epstein dealt, would

swear under oath that he never orally approved the sublet to Fisher. Fisher contends that he offered to continue paying rent directly to OFM rather than to Epstein, an offer to which the Government never responded. At that time, Fisher stopped paying rent to Epstein pursuant to the sublease.

## B. *Prior Proceedings*

### 1. *The Original Actions*

The Government commenced this action against Epstein and Fisher in October of 1996. It seeks a declaration by the Court that it is entitled to exclusive possession of the Premises and that it is entitled to have Epstein and Fisher ejected therefrom because Epstein's lease was properly terminated as of August 23, 1996. In addition, the Government seeks dismissal of Fisher's first and second counterclaims, which seek equitable relief against the Government.[2] Finally, the Government demands back rent from Epstein and/or Fisher.

In February of 1997, Epstein commenced a holdover proceeding in the Civil Court of the City of New York against Fisher for nonpayment of rent under the terms of the sublease. Fisher removed the state court action to this Court.

The Government moved for partial summary judgment on its claim for ejectment of Epstein and Fisher. In addition, it sought an order requiring Epstein and Fisher to pay into an escrow fund $15,000 per month from August 23, 1996 to the date this action is finally decided. Epstein cross-moved against Fisher to remand its holdover action to state court, and Fisher cross-moved against Epstein for consolidation of the holdover action with the pending federal action.

I heard oral argument on the motions on December 17, 1997. Collectively, Epstein and Fisher asserted four arguments in opposition to the Government's motion for summary judgment.[3] They contend that there are genuine issues of material fact as to whether the Government properly terminated the lease entered into between OFM and Epstein. Specifically, they argue, factual questions exists as to (1) whether the Government waived Epstein's alleged default of the lease by accepting rent after the Government became aware that Fisher was occupying the premises; (2) whether the OFM–Epstein lease permitted oral approval of an assignment or sublease (*i.e.*, whether the Assignment and Sublet Clause is ambiguous on the issue of whether an assignment or sublet could be approved orally); (3) whether OFM in fact orally approved the sublease to Fisher; and (4) whether the Government breached an obligation of good faith and fair dealing inherent in its lease with Epstein by unreasonably withholding written approval of a sublet to Fisher, assuming the Court holds as a matter of law that oral approval was not permitted by the lease.

At the conclusion of the argument, I resolved several of the issues pertaining to these motions on the record. As an initial matter, I denied Epstein's motion to remand and granted Fisher's motion to consolidate. I then addressed the Government's motion for summary judgment and its application concerning the creation of an escrow fund.

I granted summary judgment in favor of the Government on Epstein's and Fisher's waiver argument, holding that "no reasonable fact finder could conclude from [the] undisputed facts and the sequence of events, including the acceptance of rent after the cure period but before the actual termination

---

2. In its first counterclaim, Fisher seeks a declaration that the sublease is valid and that Fisher is lawfully entitled to full possession and use of the premises. In its second counterclaim, Fisher seeks a declaration that the sublease was automatically renewed for a five-year term, commencing January 31, 1997, because Epstein properly exercised his right of first refusal.

3. Technically, Epstein asserted only the first argument, and Fisher asserted all four arguments. Epstein is no longer occupying the Premises, but

still has an interest in the Court's decision as to whether OFM properly terminated its lease with Epstein. Moreover, Fisher's rights as subtenant derive from Epstein's rights as overtenant, for if I decide as a matter of law that the lease was properly terminated on August 23, 1996, neither Epstein nor Fisher has any right to occupy the Premises beyond that date. Thus, I will treat all four arguments in opposition to the Government's motion as though they were asserted by Epstein and Fisher jointly.

of the lease, that that could constitute a waiver in light of the very clear nonwaiver clause in the lease." (Tr. at 39). I reserved decision, however, on the following issues: (1) whether the lease unambiguously required that OFM's consent to an assignment or sublet be in writing, in which case Massey could not have orally consented, as a matter of law, to Epstein's sublet of the Premises to Fisher, (2) whether OFM was permitted under the lease to unreasonably withhold consent to Epstein's consent to a sublet to Fisher, or whether it was bound by an implied obligation of good faith and fair dealing, and (3) whether, assuming the latter, OFM in fact withheld its consent unreasonably.

Finally, I ordered Epstein to pay into an escrow fund eight days' worth of the $15,000 rent for the month of August 1996 and an additional $15,000 for September 1996 (because OFM had already accepted his tender of rent through August 23, 1996, and Epstein had collected rent from Fisher through September 30, 1996). Additionally, I ordered Fisher to pay into the fund $15,000 per month, beginning October 1, 1996 to date, and continuing for each month thereafter.

### 2. *The Government's Addition of the Subtenants as Defendants*

In the course of discovery on its claims for relief against Epstein and Fisher, the Government learned that Fisher had further sublet the Premises to the Subtenants, also without the prior written consent of OFM. The Government then sought leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15 to name the Subtenants as additional defendants in the action. I granted the Government's motion on the record at the December 17, 1997 oral argument. The Government thereafter filed a second amended complaint and served a copy on each of the Subtenants.

In an effort to settle the case, I held a conference on January 28, 1998. At the conclusion of that conference, the Government requested permission to file a motion seeking partial summary judgment against the Subtenants. By stipulation and order dated March 5, 1998, all of the named Subtenants, except for Diane Fisher d/b/a The Fisher Group and Ron Soffer, agreed to be bound by any order I entered with respect to Fisher's right to occupy the Premises. On March 13, 1998, after the Government submitted its motion, Diane Fisher executed the stipulation and order, also agreeing to be bound. To date, Soffer still has not executed the stipulation. Hence, the Government's motion for summary judgment against the Subtenants is still pending with respect to Soffer only.

### DISCUSSION

### A. *Standards for Summary Judgment*

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's

favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. As the Supreme Court stated in *Anderson,* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). With these standards in mind, I turn to the Government's motions for partial summary judgment.

## B. *The Government's Motion for Partial Summary Judgment against Epstein and Fisher*

### 1. *Whether the Lease Permitted Oral Consent to a Proposed Sublet or Assignment*

Epstein and Fisher contend that summary judgment should be denied because there exists a genuine issue of material fact as to whether OFM orally consented to Epstein's request to sublet the Premises to Fisher. The Government, on the other hand, argues that the lease unambiguously required that a sublet or assignment of the Premises be approved in advance in writing, and that, therefore, even if OFM did orally consent, such consent was invalid as a matter of law.

■ In contract disputes, the Court begins by examining the language of the contract itself to determine the parties' intent. *Stroll v. Epstein,* 818 F.Supp. 640, 643 (S.D.N.Y.), *aff'd,* 9 F.3d 1537 (2d Cir.1993). If the agreement sets forth the parties' intent clearly and unambiguously, the Court need look no further. *See Sterling Drug Inc. v. Bayer AG,* 792 F.Supp. 1357, 1365–66 (S.D.N.Y.1992), *aff'd in part, remanded in part,* 14 F.3d 733 (2d Cir.1994). Whether the text of an agreement is ambiguous or unambiguous is a matter of law to be decided by the Court. *Sterling Drug,* 792 F.Supp. at 1366. A contract is not deemed ambiguous unless it is reasonably susceptible of more than one interpretation, and the Court makes this determination by reference to the contract alone. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 152 (2d Cir.1995).

■ The lease clearly provides that Epstein was required to obtain the advance written consent of OFM to sublet the Prem-

ises to Fisher. The Assignment and Sublet Clause expressly states that "Tenant may sublet all or part of the Premises, or assign this lease or permit any other person to use the Premises *with the advance written permission of Landlord.*" (Massey Decl., Exh. B at 4) (emphasis added). Epstein's and Fisher's argument that the word "may" suggests that OFM could approve a sublease or assignment in writing or orally is tortured. Only one interpretation of this clause is tenable: prior *written* consent of OFM was required for a sublet. Epstein's and Fisher's argument would render the language of the clause meaningless, and I am obliged to read the lease in a manner that gives full force and effect to all clauses contained therein. *See Lloyds Bank PlC v. Republic of Ecuador,* No. 96 Civ. 1789 (DC), 1998 WL 118170, at *8 (S.D.N.Y. Mar. 16, 1998). Accordingly, OFM could not have orally consented to Epstein's proposed sublet to Fisher, as a matter of law, and, therefore, I need not reach the question of whether OFM actually gave oral consent.

### 2. *Whether the Lease Permitted OFM to Unreasonably Withhold Written Consent to a Proposed Sublet*

The last issue to be decided on this motion is whether OFM was entitled to refuse Epstein's proposed sublet to Fisher arbitrarily, or whether it breached a duty of good faith and fair dealing implicit in the lease agreement by unreasonably refusing to grant such consent in writing. Resolution of this issue turns on whether federal contract law or New York landlord-tenant law applies.

■ Generally, under New York law, where a lease requires a tenant to obtain the prior written consent of the landlord to sublet or assign leased premises, a landlord may refuse consent arbitrarily, unless the lease contains a clause specifically stating that the landlord may not unreasonably withhold such consent. *See Dress Shirt Sales, Inc. v. Hotel Martinique Assocs.,* 12 N.Y.2d 339, 239 N.Y.S.2d 660, 662, 190 N.E.2d 10 (Ct.App. 1963). The Assignment and Sublet Clause in the lease between OFM and Epstein required Epstein to obtain prior written consent of OFM to a proposed sublet, but it

contained no provision prohibiting OFM from unreasonably withholding such written consent.

The Government, relying on New York landlord-tenant law, asserts that it was entitled to withhold its consent to Epstein's proposed sublet to Fisher for any reason, or for no reason at all. Epstein and Fisher, however, disagree. They contend that, because the Government is a party to the lease, interpretation of the lease is governed by principles of federal common law, not New York State law. Pursuant to federal common law of contracts, Epstein and Fisher continue, the lease between OFM and Epstein contains an implied covenant of good faith and fair dealing, citing *Neal & Co. v. United States,* 36 Fed. Cl. 600 (1996), *aff'd,* 121 F.3d 683 (Fed.Cir. 1997). The requirement of good faith and fair dealing, they argue, prohibits OFM from withholding consent unreasonably. OFM's refusal to consent to Epstein's proposed sublet of the Premises to Fisher, they contend, was motivated by its desire to enter into a lease with Galinas at a higher rent beginning February 1, 1997. Such conduct was unreasonable, they argue, and, therefore, OFM breached the implied covenant of good faith and fair dealing in the lease.

 I conclude that New York landlord-tenant law rather than general federal contract principles should apply. As a threshold matter, although I agree as a policy matter that federal law should apply, there is no federal statutory or common law governing landlord-tenant relations. Federal law should apply because the United States is a party. I have jurisdiction over this action based on 28 U.S.C. § 1345 and the FMA, 22 U.S.C. § 4301 *et seq.* The subject matter of this action is a landlord-tenant dispute, however, and while application of federal law is appropriate in federal question cases where applicable federal substantive law exists, there is no federal statutory or common law

of landlord and tenant. *Powers v. United States Postal Serv.,* 671 F.2d 1041, 1042, 1045 (7th Cir.1982); *Reed v. United States Postal Serv.,* 660 F.Supp. 178, 181 (D.Mass.1987). The question remains, therefore, what law applies in the absence of a federal rule on point.

As the Supreme Court has made clear, my power to create federal common law in the absence of federal landlord-tenant law is limited. Several recent Supreme Court decisions have reaffirmed the principle that the power of the federal courts to fashion principles of federal common law is limited. *See, e.g., O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87–88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (noting that cases where the formulation of a "special federal rule" are "few and restricted"); *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 98, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (noting that a federal court "should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand") (citations omitted). While this recent Supreme Court authority leaves room for federal courts to create principles of federal common law in certain narrow circumstances, generally a "significant conflict between some federal policy or interest and the use of state law" is required before "judicial creation of a special federal rule [is] justified." *O'Melveny,* 512 U.S. at 87, 114 S.Ct. 2048. While few courts have addressed the precise issue of whether leases to which the Government is a party are governed by general federal common law of contracts or state landlord-tenant law, there is some case law on point. The Second Circuit has not yet spoken definitively on this issue,[4] but recently noted the existence of a

---

4. In *United States v. Bedford Associates,* 657 F.2d 1300 (2d Cir.1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), the Second Circuit upheld the district court's application of federal contract law to determine whether the United States and a potential lessor of a commercial building had in fact made a contract, stating that "[t]his court undoubtedly has power

to apply federal law in disputes between the United States and its lessors." *Id.* at 1309 n. 7. The court in *Kerin v. United States Postal Serv.,* 116 F.3d 988 (2d Cir.1997), acknowledged the *Bedford Associates* decision, but implied that *Bedford Associates* involved the issue of *creation* of a lease only, stating that there is "room for fair debate" as to whether federal or state law ap-

conflict between the Federal Circuit and the Seventh Circuit concerning "whether federal common law or state law applies to the interpretation of Postal Service Leases." *Kerin v. United States Postal Serv.*, 116 F.3d 988, 990 (2d Cir.1997). On the one hand, the Federal Circuit has held that federal law applies to resolve disputes between the United States and its lessors or tenants. *See, e.g., Forman v. United States*, 767 F.2d 875, 879–80 (Fed.Cir.1985);[5] *Kelley v. United States*, 19 Cl.Ct. 155, 162 (1989). On the other hand, the Seventh Circuit has held that state substantive law governs in landlord-tenant disputes involving the Government. *See Powers v. United States Postal Serv.*, 671 F.2d 1041, 1043–46 (7th Cir.1982).[6]

The Second Circuit in *Kerin* did not reach the issue of whether federal common law or state law applied because, in that case, federal law and state law led to the same result. *See Kerin*, 116 F.3d at 991. I agree with the Seventh Circuit's conclusion, for two reasons.

First, although Epstein and Fisher argue that a federal rule should be created to promote the creation of a uniform body of law in landlord-tenant disputes involving the Government, there is no "distinct need" for a nationwide legal standard or a uniform national rule. *See Kamen*, 500 U.S. at 98, 111 S.Ct. 1711. Landlord-tenant law traditionally has been a matter of state law. There is no compelling reason to disrupt expectations that tenants and landlords may have under state law merely because they are entering into a lease with the federal government. Courts have long held that, "[a]bsent controlling federal legislation or rule of law, questions involving real property rights are de-

termined under state law, even when the United States is a party." *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986) (citing *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378–81, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977)).[7]

Second, application of state substantive law directly on point is eminently more logical than application of general principles of federal contract law. While application of general federal contract law to Government contracts may be appropriate in certain instances, where, as here, the particular government contract is a lease for the use of real property, the adoption of state common law of landlord-tenant relations, a body of law that has developed precisely to address the rights and duties of individuals in the unique relationship of landlord and tenant, makes sense. Application of the state rule, which permits a landlord to refuse consent to a sublet or assignment arbitrarily in the absence of a clause to the contrary, better serves the interests of the Government as a landlord because it permits the Government to have unfettered discretion in deciding who occupies its property. Given the sensitive political considerations that often come into play when governmental property, such as the property here in issue owned by Iran, is involved, the Government should have as much discretion as possible.

Noting that federal landlord-tenant law does not exist, Judge Posner stated in *Powers:*

> The Federal Courts could of course create that law, picking and choosing among existing state laws and proposed reforms in accordance with the recommendations of

---

plies to the *interpretation* of a lease to which the Government is a party. *Id.* at 990–91.

5. While the *Forman* court stated that federal law governs in landlord-tenant disputes involving the Government, it nevertheless relied on state law cases in interpreting the particular provision of the Postal Service lease at issue. *See* 767 F.2d at 880–81.

6. Other courts, too, have applied state substantive law as the rule of decision in landlord-tenant disputes involving the Government. *See, e.g., Braxton v. United States*, 858 F.2d 650, 655 (11th Cir.1988) (holding that Florida law applies to determine whether one who occupies land for-

feited by the Government must pay the Government a reasonable rent for the period of his occupancy); *Reed*, 660 F.Supp. at 181 (holding that Massachusetts law governs the rights of the parties under a Postal Service lease).

7. Indeed, the Supreme Court has articulated that the normal federal disposition where no substantive federal provision is relevant to the legal issue at hand is for "federal courts [to] 'incorporat[e] [*state law*] as the federal rule of decision.'" *Kamen*, 500 U.S. at 98, 111 S.Ct. 1711 (emphasis added) (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)).

eminent scholars and practitioners. It is not to be expected that the federal courts would do a very good job of devising a model code of landlord-tenant law, since they have very little experience in landlord-tenant matters; and though eventually some body of law would emerge it would not in all likelihood be a uniform body, because there are [thirteen] federal circuits and the Supreme Court could be expected to intervene only sporadically . . . .

. . . [W]e do not have to balance competing federal and state interests in this case after all. The overriding federal interest here is in certainty of right and obligation flowing from conformity to known law; the state interest is in offering its landlords a like certainty. These interests converge in favor of adopting . . . state law rather than federal common law.

*Powers,* 671 F.2d at 1045–46. This reasoning is quite convincing, particularly in a case such as this, where the Government and Epstein, in all likelihood, "entered [a] legal relationship with the expectation that their rights and obligations would be governed by state-law standards." *Kamen,* 500 U.S. at 98, 111 S.Ct. 1711.

Finally, Epstein's and Fisher's reliance on *Neal & Co. v. United States,* 36 Fed. Cl. 600 (1996), *aff'd,* 121 F.3d 683 (Fed.Cir.1997), is therefore misplaced. There, the United States Court of Federal Claims stated that "[e]very contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing," *id.* at 631, and from this statement, Epstein and Fisher extrapolate that there exists an implied covenant of good faith and fair dealing in the lease agreement between Epstein and the Government at issue here.

The facts of *Neal & Co.* are distinguishable, however. *Neal & Co.* involved a construction contract to build a housing project entered into between the Government and a contractor, not a lease for occupancy of real property. While a lease is a type of contract, the considerations surrounding a lease of real property are sufficiently different from those involved in a conventional contract as to militate against the extension of *Neal & Co.* and like cases to landlord-tenant disputes. A construction contract does not implicate the Government's rights, as a possessor of a valuable leasehold, to regulate the possession and use of real property under its control.

Thus, as between general federal contract principles and specific state landlord-tenant law, the latter should be applied. Land is unique. It is logical, therefore, that a landlord should have virtually complete say in who occupies its property. *See Mann Theatres Corp. v. Mid–Island Shopping Plaza Co.,* 94 A.D.2d 466, 464 N.Y.S.2d 793, 798 (2d Dep't 1983) (noting that landlords have a "substantial interest in controlling the assignability of leases"), *aff'd,* 62 N.Y.2d 930, 479 N.Y.S.2d 213, 468 N.E.2d 51 (Ct.App. 1984). It makes sense for the law to permit a landlord to unreasonably withhold consent to a proposed sublet unless the parties specifically bargain otherwise. *See* Alex M. Johnson, Jr., *Correctly Interpreting Long–Term Leases Pursuant to Modern Contract Law: Toward a Theory of Relational Leases,* 74 Va. L.Rev. 751, 758 (1988) (discussing the majority view that absent contractual agreement to the contrary landlords are permitted to unreasonably withhold consent to a sublet or assignment, and noting that the rule stems from the "paramount importance of the lessor's ability to control the selection of his tenants so as to protect the value of his reversionary interest" in the leasehold).

I therefore adopt the relevant rule of New York landlord-tenant law for purposes of deciding the remaining issue in this dispute, and hold that, consistent with New York law, OFM was entitled to arbitrarily withhold its consent to Epstein's request to sublet the Premises to Fisher. Even assuming OFM had a hidden agenda in refusing Epstein's request to sublet to Fisher, specifically, that it preferred to enter into a new lease with Galinas at a higher rental price, it was entitled to withhold its consent to a sublet for a good reason, a bad reason, or no reason at all. There existed no implied covenant of good faith and fair dealing in its lease with Epstein requiring OFM to act reasonably in deciding whether to approve Epstein's proposed sublet, and, therefore, OFM cannot be held liable for a breach thereof.

**414**

Thus, I need not reach the issue of whether OFM in fact unreasonably withheld consent. And, as Fisher was occupying the Premises pursuant to an illegal sublet, OFM was within its rights to terminate Epstein's lease. Accordingly, the Government's motion for partial summary judgment on its claim for ejectment of Epstein and Fisher from the Premises is hereby granted.

### C. *The Government's Motion for Partial Summary Judgment Against the Subtenants*

Eleven of the twelve Subtenants signed a stipulation agreeing to be bound by the Court's decision on the Government's claim for ejectment against Epstein and Fisher. I now grant the Government's motion for partial summary judgment against Epstein and Fisher; hence, the motion is also granted with respect to these eleven Subtenants.

The remaining Subtenant, Ron Soffer, did not sign the stipulation. He has not responded to the Government's motion because the motion is not returnable until April 20, 1998. Soffer, however, can have no greater rights than Fisher. Hence, the Government's motion is granted as to Soffer as well. Of course, if Soffer believes he has some basis for arguing that he has greater rights than Fisher has, he may make a motion for reconsideration within ten days hereof.

### CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment on its claim for ejectment is granted as to Epstein, Fisher, and all of the Subtenants.

SO ORDERED.