# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 35064

SCOTT ORROCK, derivatively on behalf of )
MICRON TECHNOLOGY, INC. )
  )
               Plaintiff/Appellant, )
v. )
  )
STEVEN R. APPLETON, WILBUR G. )
STOVER, JR., MICHAEL W. SADLER, )
JAMES W. BAGLEY, ROBERT A. )
LOTHROP, GORDON C. SMITH, )
WILLIAM P. WEBER, THOMAS T. )
NICHOLSON and DON J. SIMPLOT, )
  )
            Defendants/Respondents. )
  )

Boise, June 2009 Term of Court

2009 Opinion No. 100

Filed: July 16, 2009

Stephen W. Kenyon

Appeal from the Fourth Judicial District of the State of Idaho, Ada County. Hon. Darla Williamson, District Judge.

The decision of the district court is <u>affirmed.</u>

Rossman Law Group, Boise, and Robins Umeda, San Diego, California, for appellant. Mark Umeda argued.

Greener, Burke & Shoemaker, Boise, Douglas W. Greene, Seattle, Washington, and Davie Lansky, Palo Alto, California, for respondents. Barry Kaplan argued.

_____

W. JONES, Justice

This case stems from a shareholder derivative action filed by Scott Orrock (Orrock) on behalf of Micron Technology, Inc. (Micron) against the officers and directors of Micron. The complaint alleged that some of the officers and directors violated state law, breached their fiduciary duties, abused their control, engaged in gross mismanagement, wasted corporate assets and were unjustly enriched thereby causing substantial loss and damages to Micron. The district court dismissed the action pursuant to I.R.C.P. 12(b)(6) for failure to state a claim upon which relief may be granted. Orrock appeals to this Court.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

The complaint generally alleges that members of the Micron board and Micron officers were engaged in a scheme to manipulate the price of Dynamic Random Access Memory (DRAM) products. Orrock brought this derivative action for injuries suffered as a result of breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, and aiding and abetting thereof. Orrock names Steven R. Appleton (Appleton), Wilbur G. Stover, Jr. (Stover), Michael W. Sadler (Sadler), James W. Bagley (Bagley), Robert A. Lothrop (Lothrop), Gordon C. Smith (Smith), William P. Weber (Weber), Thomas T. Nicholson (Nicholson), and Don J. Simplot (Simplot) as defendants in this action. Prior to filing a shareholder derivative action the plaintiff must demand that the board of the corporation take action. A derivative action may not be maintained unless the plaintiff can show that demand would be futile. The district court found that Orrock had failed to sufficiently plead facts showing that demand on the board would have been futile. Therefore, the district court dismissed this action pursuant to I.R.C.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

The third amended complaint alleged the following facts[1] in relation to whether demand on the board would be futile:

Micron is a manufacturer of memory technology and produces DRAM products. DRAM constitutes 95% of Micron's revenue. Appleton, Bagley, Lothrop, Smith and Weber served on the Board during the relevant period.[2] These five members constitute a majority of the Board.

A Micron representative, in a 2001 email, stated that Micron would "be increasing prices to all of the [Original Equipment Manufacturer] customers."

The Department of Justice (DOJ) issued a federal grand jury subpoena to Micron demanding documents relating to the pricing and sales of DRAM chips. In response to the DOJ's subpoena Appleton, Bagley, Lothrop, Smith and Weber allowed Micron to alter handwritten notes and other documents relating to the pricing and sales of DRAM products. In November of 2004 Appleton responded to the allegations and investigation by publicly stating that it was "not possible to control prices in [the DRAM] industry" and that the DOJ's

---

[1] Any conclusory statements are not listed in order to evaluate whether sufficient facts were pled to support the allegation that demand on the board would have been futile.

[2] The "Relevant Period" is defined as February 2001 to the present.

investigation was merely "theoretical." Micron would be subject to billions of dollars in liability for any violations of applicable securities and antitrust laws.

Sadler met with CEO's of DRAM manufacturing companies and discussed cutting DRAM production. In October 2001, Sadler traveled to Munich, Tokyo, Taiwan and Seoul. Appleton had knowledge of Sadler's actions. Appleton scheduled a visit to Munich to meet with the CEO's of Infineon and Samsung regarding cut backs in DRAM production.[3] In June 2002, Appleton, Bagley, Lothrop, Smith and Weber were aware that Micron was likely involved in the DRAM price-fixing conspiracy based on the DOJ's announcement and investigation into Micron's role and numerous news articles in the *Idaho Statesman*, the *New York Times*, and the *Wall Street Journal*. The Articles collectively contain the following information: (1) the CEO of Dell Computers blamed the skyrocketing prices of memory chips on "cartel-like behavior by a couple of DRAM suppliers;" (2) industry experts believed the DOJ investigation to be focused on "companies artificially pushing prices up;" (3) Micron was being investigated by a grand jury for anticompetitive practices which implied that criminal charges may follow; (4) Micron cut DRAM supply by 20% between September 2001 and March 2002, which is one of the most dramatic cuts made by a DRAM manufacturer; (5) DRAM prices were on average $1.97 each in the fourth quarter of "last year" and $4.50 each in the first quarter of 2002; (6) the vice president of Mosel-Vitelic "confirmed that his company had reached an agreement with Hynix and Samsung Electronics to push up DRAM prices to $3 a chip by stopping dumping of the chip;" and (7) twenty-six class action lawsuits had been filed naming Micron as a defendant with allegations of secrecy and conspiracy to fix memory prices. Micron's Board took no investigatory action in response to these allegations by the news sources. Specifically, Appleton, Bagley, Lothrop, Smith and Weber conducted no investigation as to whether any of Micron's employees were involved in the alleged conspiracy or whether Micron would be subjected to liability if such a conspiracy existed.

*Forbes* magazine called Appleton the "worst performing boss in America." *Forbes* listed Appleton's annual compensation based on a six-year average at $7.8 million despite an overall decrease in Micron's stock.

Micron has an on-going business relationship with Lam Research Corporation (Lam) for semiconductor manufacturing equipment and related services. Over a five-year period Micron

---

[3] The wording in the complaint indicates that this trip never occurred.

paid Lam $326.5 million for semiconductor manufacturing equipment and related services. Bagley is the current Executive chairman and former CEO of Lam. Mercedes Johnson (Johnson)[4] served as Senior Vice President of Finance for Lam.

Lothrop, Smith and Simplot were business associates at the J.R. Simplot Company which is an agribusiness company. Lothrop served as Senior Vice President from 1986-1991. Smith served in various management positions from 1980-1994, including three years as President and CEO and seven years as CFO. Simplot served as President of Simplot Financial Corporation from 1985-1992, which is a wholly owned subsidiary of the J.R. Simplot Company. Simplot has also worked for the J.R. Simplot Company since 1955 in various capacities, including director.

Smith had access to internal corporate documents, conversations and other non-public information. While in possession of this information Smith sold 10,000 shares of Micron stock for proceeds of $352,400.[5] On July 20, 2007, Smith made certain accusatory statements to the *Idaho Statesman*, such as: (1) Micron is in need of new management and potentially a new Board; (2) this "change at the top" should have been made a long time ago; (3) the Board was not prepared to make any necessary changes; (4) the Board is "very passive" and not "well-informed;" (5) if the Board had been more "aggressive" and "inquiring" any damage caused to Micron due to faulty management could have been avoided; (6) Smith was equally at fault for his failure to timely speak out against Appleton and other members of the Board; and (7) the business relationship between Bagley and Lam is so strong that Bagley would not speak out against Appleton. On July 25, 2007 Smith resigned from the Micron Board.

The Governance and Compensation Committee at Micron reviews and approves the CEO's compensation. This Committee is responsible for: (1) evaluating director and Board committee member compensation, (2) recommending the appropriate level of director compensation, (3) reviewing and approving corporate goals and objectives relevant to the CEO's compensation, (4) evaluating the CEO's performance in light of the goals and objectives, (5) determining the CEO's compensation level, (6) reviewing performance of the individual directors, (7) determining whether a director should be nominated for an additional term, and (8) oversight of the Board's evaluation of it's performance and the performance of management. Lothrop and Weber consist of two-thirds of the Governance and Compensation Committee.

---

[4] Johnson was a board member at the time this complaint was filed, but not a named defendant in the action.
[5] Smith is one of the named directors accused by Orrock of engaging in illegal insider selling for proceeds obtained from the sale of Micron stock.

4

The Audit Committee is responsible for, (1) conducting a quarterly review of the Company's system of internal controls, and (2) periodically reviewing, along with Micron's General Counsel, Micron's compliance with legal and regulatory requirements. Lothrop, Smith and Weber were all members of the Audit Committee at some point during the relevant period.[6]

Smith and Weber have received an additional $10,000 in compensation for holding positions as chairmen of the Audit Committee and Governance and Compensation Committee. Bagley, Lothrop, Smith and Weber each receive an annual retainer of $50,000.[7]

Appleton is primarily employed by Micron. Over a five-year period Micron paid Appleton $1,268,128 in bonus compensation, $2,696,114 in salary, $851,900 in restricted stock awards and granted Appleton options to purchase 2,350,000 shares of stock. Compensation for Appleton is determined by the Governance and Compensation Committee.

Orrock further alleged that demand on the individual shareholders of Micron would be futile because, (1) Micron is a publicly held company with over 618 million shares outstanding, (2) such demand would be impossible because Orrock has no means to discover names, addresses or phone numbers of the shareholders, and (3) regardless if the shareholders could be discovered, demand would cause Orrock a huge expense.

Orrock then alleges the following conclusions follow from the above stated facts:

Demand on Appleton, Bagley, Lothrop, Smith and Weber would be futile because they each face a substantial likelihood of liability for their breaches of fiduciary duties to Micron as a result of their involvement and conduct relating to the price-fixing conspiracy. Each of the above directors knew or consciously ignored Micron's role in the DRAM price-fixing conspiracy and took no action to prevent liability on behalf of Micron, thereby subjecting the named directors to personal liability. As information developed as to the existence of a DRAM price-fixing scheme the above named directors failed to investigate if employees were involved and failed to mitigate any damages on behalf of Micron.

Demand on Lothrop, Smith and Weber would be futile because they would be subjected to liability pursuant to their roles on the Audit Committee. The members of the Audit Committee may be subject to liability for breach of fiduciary duties of due care, loyalty and good

---

[6] Orrock cites Micron's Proxy Statement as filed with the SEC as the source of this information.
[7] The pleadings do not indicate the purpose of this retainer.

faith because the Audit Committee failed to take action or prevent directors, officers or employees from engaging in DRAM price-fixing.

Demand on Appleton, Bagley and Smith would be futile because they lack independence from Lothrop and Weber; as members of the Governance and Compensation Committee Lothrop and Weber determine each director's salary. Appleton, Bagley and Smith lack independence because it would jeopardize their personal financial compensation.[8] Demand on Bagley, Lothrop, Smith and Weber would be futile because they lack independence because of their interest in maintaining their positions on the Board and to preserve their substantial compensation.

Demand on Bagley would be futile because he lacks independence in evaluating Appleton's behavior because of Bagley's business involvement with Lam and Lam's business relationship with Micron.

Demand on a majority of the Board, that is Appleton, Bagley, Lothrop, Smith and Weber, would be futile because they have not exercised independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected Micron to liability, thereby subjecting themselves to personal liability. The above individuals, due to their inter-related business, professional and personal relationships, have conflicts of interest that prevent the Board from taking action on behalf of Micron.

## ISSUE ON APPEAL

Whether the district court erred in granting defendant's motion to dismiss pursuant to I.R.C.P. 12(b)(6).

## STANDARD OF REVIEW

Both parties state that Delaware law applies in this case because Delaware is the state of incorporation for Micron. See *Kamen v. Kemper Fin. Services, Inc*., 500 U.S. 90, 101 (1991) (holding that the law of the state of incorporation generally governs the internal matters and governance of a corporation and that whether demand is required relates directly to the internal governance of the corporation); See also *Sword v. Sweet*, 140 Idaho 242, 246, 92 P.3d 492, 496 (2004) (one of the factors used to determine the proper choice of law for contracting parties

---

[8] In the complaint, Orrock lists the names of all the members of the Board who served at any point during the Relevant Period. To prevent confusion, this opinion only discusses the members of the board named as defendants.

would be the state of incorporation).  However, the parties go a step further and state that Delaware employs a *de novo* review, and that is the appropriate standard of review for this case.[9] This Court declines to apply a foreign jurisdiction's procedural law regardless if we are applying that jurisdiction's substantive law.  See *Sword*, 140 Idaho at 247, 92 P.3d at 497 (where this Court applied Idaho's standard of review to the procedural aspect of the claim and Indiana's law for the substantive portions of the claim).  Therefore, Idaho law will dictate the procedural aspects of this case and Delaware law applies to the substantive claims.

"[T]he following defenses shall be made by motion: . . . (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted[.]"  I.R.C.P. 12(b)(6).  "In reviewing a ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the question is whether the non-movant has alleged sufficient facts in support of his claim, which if true, would entitle him to relief."  *Rincover v. Dep't of Fin.*, 128 Idaho 653, 656, 917 P.2d 1293, 1296 (1996).  This Court makes "every reasonable intendment" in order to "sustain a complaint against a motion to dismiss for failure to state a claim."  *Idaho Comm'n on Human Rights v. Campbell*, 95 Idaho 215, 217, 506 P.2d 112, 114 (1973).  In a derivative action "[t]he complaint shall . . . allege *with particularity* the efforts, if any, made by the plaintiff to obtain the action which plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  I.R.C.P. 23(f) (emphasis added).

## ANALYSIS

**The district court did not err in granting defendant's motion to dismiss pursuant to I.R.C.P. 12(b)(6).**

> A stockholder's derivative action is an action brought by one or more stockholders of a corporation to enforce a corporate right or remedy a wrong to the corporation in cases where the corporation, because it is controlled by the wrongdoers or for other reasons fails and refuses to take appropriate action for its own protection.

*McCann v. McCann*, 138 Idaho 228, 233, 61 P.3d 585, 590 (2002) (quoting 19 Am. Jur. 2d *Corporations* § 2250, 151-52 (1986)).  "To prevent abuse of [a shareholder derivative suit] . . . equity courts established as a precondition 'for the suit' that the shareholder demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by

---

[9] Delaware does review the sufficiency of the pleadings in a stockholder derivative action *de novo.  Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).

7

extraordinary conditions.'" *Kamen*, 500 U.S. at 95-96 (quoting *Ross v. Bernhard*, 396 U.S. 531, 534, 1970)). The demand requirement "affords the directors an opportunity to exercise their reasonable business judgment[.]" *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533 (1984). "[T]he function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'" *Kamen*, 500 U.S. at 96-97.

Any factual allegations will be accepted as true, unless they are purely conclusory. *Rales v. Blasband*, 634 A.2d 927, 931 (Del. 1993). The test in a shareholder derivative action is whether the plaintiff alleged "particularized facts to creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand." *Id.* at 930. To determine whether demand is futile the court must decide "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Brehm v. Eisner*, 746 A.2d at 253-54 (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) (*overruled on other grounds*)).

Accepting all the facts alleged as true, Orrock insufficiently pled that demand on a majority of the Board at Micron would be futile. The facts generally show that Appleton has a significant financial interest at stake in the matter and may be subjected to personal liability for his failure to act in light of allegations of Micron's involvement in price-fixing. However, there are insufficient facts which tend to show that a majority of the other board members had knowledge of any DRAM price-fixing among DRAM manufacturers as reported in the news sources, that any of the board members consciously disregarded any of the "red flags,"[10] or that the Board members failed to investigate or take remedial action.[11]

Orrock did not request access to the books and records of Micron to investigate whether information existed within the company records which may tend to support his allegations. A simple request for access to the company records might have indicated whether an investigation was in fact conducted by Micron's board or information was ignored by Micron's board, or whether Micron's board refuses access to the company records. The complaint was insufficient

---

[10] Orrock repeatedly referred to the "red flags" that should have warranted an investigation by the board as to whether Micron was engaged in any DRAM price-fixing scheme. Those "red flags" consist of the newspaper articles, the DOJ investigation, and various other statements made to the public.

[11] Orrock alleges that the Board failed to investigate or take remedial action but does not state what, if any, action he took to discover what the Board may or may not have done in either regard.

8

to withstand an I.R.C.P. 12(b)(6) motion for failure to state a claim upon which relief may be granted. Shareholder derivative actions require the plaintiff to plead with particularity; Orrock's third amended complaint insufficiently pled that demand on the Board would be futile.

## CONCLUSION

For the foregoing reasons, this Court affirms the decision of the district court. Costs to Respondent.

Chief Justice EISMANN, Justices BURDICK and HORTON, **CONCUR.**

J. JONES, J., specially concurring.

I concur in the Court's opinion because, even after four tries, the plaintiff was unable to adequately plead that he was excused from the requirement of making demand upon the board of directors to take remedial action. Several aspects of the plaintiff's case, particularly the timing aspects, present concerns that deserve mention.

It must first be acknowledged that shareholder derivative actions provide a useful tool for redress where corporate management wastes corporate assets or otherwise harms the interests of the corporation. However, the remedy is designed for sparing use and various mechanisms have been put in place to winnow out cases where shareholder complaints lack substance. In order to pursue a case, the shareholder must allege particularized facts that management engaged in conduct detrimental to the corporation, that the shareholder owned stock in the corporation at the time of such conduct, that the shareholder made demand upon the directors to take remedial action, and that no such action was taken. While Orrock pointed to conduct by certain management personnel that was clearly detrimental to Micron – the price-fixing which resulted in a number of civil damage actions being filed against Micron – he failed to state any facts that would (1) indicate the defendant directors had sufficient contemporaneous knowledge of the price-fixing activity to do anything about it before it ended, or (2) indicate the directors took no investigative or remedial action thereafter. None of the four versions of the complaint say what, if any, action Orrock took between June of 2002, when it became generally known the Department of Justice (DOJ) was investigating allegations that Micron had participated in a price-fixing conspiracy, and March of 2006, when Orrock filed his initial complaint.

According to Orrock's third amended complaint, when it became known in June of 2002 that the DOJ was investigating Micron's possible involvement in fixing the price of DRAM chips, there was "no doubt" the defendant directors were aware that Micron was likely involved

9

in the DRAM price-fixing conspiracy. He alleges that, notwithstanding such awareness, the directors did nothing to investigate or pursue remedial action. It would seem that the price-fixing was over and done with by the time the directors should have become aware of it, based on Orrock's allegations, but at that point the directors could do nothing to put a stop to it. The horse had escaped the barn. The only course of action available to the directors at that time was to look into the facts, find out what management personnel may have done, and, if in the best interest of the company at that point, pursue remedial action against them. The directors had a responsibility to investigate once the DOJ inquiry became known but Orrock provides nothing, other than speculation, to show that they did not do so. He does not allege in any of the four versions of his complaint that he sought to obtain information from the corporation, to examine corporate records, or to otherwise determine what, if anything, the corporation was doing or had done. One might expect that a concerned shareholder, reading the news articles generated by the DOJ investigation, would have taken some action or demanded that the board of directors investigate and attempt to rectify the wrongdoing sometime earlier than almost four years later, when Orrock filed his initial complaint. If Orrock was, indeed, a concerned shareholder between June 2002 and March 2006, it would not have taken a great deal of effort to write up a summary of the news accounts and send it to the board of directors to demand remedial action.

Making a demand pursuant to I.R.C.P. 23(f) is not an extremely onerous undertaking. As we have explained:

> The demand on the directors need not assume a particular form nor need it be made in any special language. However, the stockholder must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action in the corporate name. Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success. The shareholder must state facts, not mere general charge and conclusions.
>
> The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand.

*McCann v. McCann*, 138 Idaho 228, 235, 61 P.3d 585, 592 (2002) (quoting 19 Am. Jur. 2d *Corporations* § 2278, 173-74 (1986)).

The Delaware Supreme Court explains the purpose of making such a demand:

10

The demand requirement serves a salutary purpose. First, by requiring exhaustion of intracorporate remedies, the demand requirement invokes a species of alternative dispute resolution procedure which might avoid litigation altogether. Second, if litigation is beneficial, the corporation can control the proceedings. Third, if demand is excused or wrongfully refused, the stockholder will normally control the proceedings.

The jurisprudence of *Aronson* [*v. Lewis*, 473 A.2d 805 (Del. 1984)] and its progeny is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms; and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.

*Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000) (quoting *Grimes v. Donald*, 673 A.2d 1207, 1216-17 (Del. 1996)).

So, the demand is necessary in order to give the board of directors the opportunity to do the right thing. There is no indication as to what kept Orrock from making a demand, even at the late date he decided to take action against Micron's management. In order to survive a motion to dismiss, it was Orrock's obligation to particularly allege the efforts he made to obtain the action which he desired from the directors and the reasons for his failure to obtain the action. I.R.C.P. 23(f). While he cited articles that appeared in the media and speculated about what the board may or may not have done, he did not allege he took any action whatsoever to find out what the facts were or to get the directors to do something about it.

The question also arises as to what action the directors might have taken when it became known that corporate management personnel had been involved in the DRAM price-fixing conspiracy. Investigation by the directors was obviously required; their fiduciary obligations would have dictated that they search out the facts. The complaint contains no fact-based allegation showing they failed to do so. Orrock's complaint indicates that Micron suffered substantial damage because of the dozens of civil anti-trust lawsuits brought against it. No doubt that is so. Orrock's complaint assumes that the only remedial action the directors could have taken was to file suit against corporate management personnel who took part in the price-fixing conspiracy. However, the directors may have concluded that taking action against the responsible management personnel would have aggravated the situation, providing additional fodder to those

11

seeking anti-trust damages against the company. In other words, the best strategy to protect Micron's interests, after the misconduct became known, may have been to hunker down until the litigation storm blew over. Because Orrock apparently made no effort to find out what the directors may or may not have done to protect the company's interests and since we are provided with no particularized facts indicating that the directors did absolutely nothing, we can only speculate. With no factual allegations indicating to the contrary, the business judgment rule presumes the directors' actions were in Micron's interest.

Another difficulty with the complaint relates to the requirement that a shareholder derivative plaintiff allege he was a shareholder "at the time of the transaction of which the plaintiff complains." I.R.C.P. 23(f). In his four versions of the complaint, Orrock merely alleges that he "is, and was at times relevant hereto, an owner and holder of Micron common stock." The complaints define a "Relevant Period" as being February 2001 to the "present", but do not allege Orrock was a shareholder during that defined period. The actual period in which Orrock appears to allege the defendant directors failed to take action to investigate and remediate the price-fixing was June 2002 to March 2006. It would have been easy enough to allege that this was the time period during which Orrock owned Micron stock. Since a derivative action is only available to a person who was a shareholder at the time of the transaction that is complained of in the complaint, it is not asking too much that the shareholder wishing to pursue a derivative action assert, affirmatively, that he held the stock during that period of time.

Orrock's failure to affirmatively allege his ownership of Micron stock during the "Relevant Period", combined with the almost four years that elapsed between disclosure of the DOJ investigation and the filing of the initial complaint, gives the appearance of a Johnny-come-lately lawsuit where the decision to sue was made only after most of the facts relating to the price-fixing conspiracy had become known and the time to make an effective demand for redress had long passed. Again, without the necessary factual allegations, one can only speculate.

The derivative action provides shareholders a useful and necessary avenue of redress where corporate management acts contrary to the interests of the corporation. However, a shareholder pursuing this course must observe the limitations designed to prevent misuse of the derivative action. Among other things, the shareholder must first give management the opportunity to correct the misconduct, unless excused for some lawful reason. Here, Orrock simply has not made the necessary fact-based allegations, even after three amended versions of

the initial complaint, to show that he should be excused from making a demand.  Thus, the district court acted properly in dismissing the case.