FILED
United States Court of Appeals
Tenth Circuit

April 9, 2021

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DANIEL ORTIZ,

    Plaintiff - Appellant,

v.

SARAH TORGENSON, Officer; ROGER
PETERSON, Lt.; GLENN PICKETT, Sgt.;
RUSTY BRAITHWAIT, Officer; FNU
ALLRED, CHS; FNU GEORGE, CHS;
HEATHER ANDERSON, Sgt.; FNU
EKKART, Officer; BRUCE O.
BURNHAM, M.D.; TIMOTHY DENNIS,
PA; CLIFF SORENSON, Officer;
ROBBIE SYLVESTER, Sgt.,

    Defendants - Appellees.

No. 19-4163
(D.C. No. 2:17-CV-00328-TC)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

    Daniel Ortiz, a Utah state prisoner proceeding pro se, appeals from the district

court's grant of summary judgment against him in a civil rights lawsuit brought

---

    [*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

against certain prison guards and medical professionals. He also appeals the district court's denial of his motion to compel discovery. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, vacate in part, and remand for further proceedings.

## I.     STANDARDS OF REVIEW

We review the district court's summary judgment ruling de novo, viewing the evidence in the light most favorable to Ortiz. *See Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017). When some contradictory evidence exists, the basic summary judgment question is whether a reasonable jury could find for the nonmovant on the disputed issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

We review the district court's discovery ruling for abuse of discretion. *See Punt*, 862 F.3d at 1046.

## II.     FACTUAL BACKGROUND

The evidence in the light most favorable to Ortiz is as follows.

### A.     The Attack on Ortiz

Ortiz is a Utah state prisoner housed at the Central Utah Correctional Facility in Gunnison, Utah. To prevent violence between the Norteño and Sureño prison gangs, the prison uses an A/B day rotation. Sureños are allowed out of their cells only on A days, and Norteños only on B days. Ortiz was considered a Sureño.

Wednesday, July 29, 2015, was a B day and Ortiz was locked down in his cell, per the usual rotation. Sometime in the afternoon, however, defendant Torgenson

(a control room officer) ordered Ortiz to attend an Offender Management Review (OMR), and opened his cell door for that purpose. An OMR is a meeting requested by an inmate to discuss housing, safety, or other issues with prison staff. Although an inmate requests the meeting, prison staff decides when to hold it.

As ordered, Ortiz left his cell and walked without incident to the OMR room. He felt uncomfortable doing so, however, because he saw "many inmates"— presumably rival Norteños—"walking about" through the housing unit. R. vol. I at 82, ¶ 4.

Inside the OMR room were prison officials of varying ranks and roles, including defendants Allred, Braithwaite,[1] George, Peterson, and Pickett. The purpose of the OMR was to discuss a complaint from Ortiz about a matter unrelated to this lawsuit. According to Ortiz, the discussion was abrupt, and Peterson then ordered him to return to his cell. Ortiz protested that he "thought [he] had seen . . . Norte[ñ]os out and that [he] may be in danger." *Id.* at 83, ¶ 5. "At that," he says, "I was told by defendant Peterson, not to worry, 'The Norte[ñ]os are locked down, just head straight down to your cell and rack in.'" *Id.*

But the Norteños were not locked down. Ortiz had barely exited the OMR room into the hallway leading to his housing unit before two of them attacked him. Peterson and other officials subdued the attackers and extricated Ortiz, but not before

---

[1] The caption spells Braithwaite's name as "Braithwait." In briefing and in the record below, his counsel refers to him as "Braithwaite," so we presume this is the correct spelling.

3

he sustained injuries.[2]

## B. The Out-of-Bounds Incident

About two-and-a-half months later (October 10, 2015), Ortiz was singing songs with other inmates just outside an unnamed inmate's cell. Defendant Anderson—a housing sergeant who began working in Ortiz's unit a little after the July 29 incident—broke up this group and issued Ortiz a disciplinary charge for going "out of bounds" (*i.e.*, "stepping inside another inmate[']s cell"). *Id.* at 161, ¶ 17. Anderson immediately "placed [Ortiz] on T.R.O. which is Temporary Restriction Order, a 'temporary' lockdown and loss of privileges for up to 18 working days (Mon-Fri)." *Id.* Ortiz's cellmate, Robert Cruz, also received an out-of-bounds charge and was placed in T.R.O. lockdown. Cruz had never known of an inmate placed in T.R.O. lockdown for an out-of-bounds violation. Another inmate named Garcia received an out-of-bounds charge arising from the same incident but Anderson did not place him on T.R.O.

Ortiz had a "T.R.O. interview" with Anderson and Peterson on October 15. *Id.* ¶ 18. During the interview, they did not discuss the out-of-bounds charge. Peterson instead told Ortiz that a senior supervisor had been transferred away from Ortiz's housing unit because of Ortiz's grievance regarding the attack on July 29. Peterson "then kept going on about how because of that grievance he had gotten in alot [*sic*] of trouble and had to work days without pay." *Id.* at 162, ¶ 20. Anderson, for her part,

---

[2] We provide more details about his injuries and the treatment he received when we discuss his medical care claim, below.

"began to reprimand [Ortiz] about asking [prison officials] for a grievance form on October 10, when [he] was first placed on T.R.O. She yelled at [Ortiz] for asking another inmate . . . to retrieve a grievance form for [him]." *Id.* at 161, ¶ 19. And she said to Ortiz, "You complain too much, I don[']t want you in my housing unit." *Id.* at 162, ¶ 21 (internal quotation marks omitted).

Ortiz's cellmate, Cruz, had his T.R.O. interview around the same time. Cruz says that, during that interview, Peterson said "Ortiz had snitched and had confessed that we were drinking prison brew." *Id.* at 170, ¶ 6. Cruz also stated that Peterson said "Ortiz was working with [prison officials] and that [he] had told on all of us, that we were breaking the rules and drinking 'hooch.'" *Id.*

Around this time, Anderson imposed a second disciplinary charge against Ortiz. The record is ambiguous about whether she imposed the second charge at the same time as the out-of-bounds charge (October 10), or not until after the T.R.O. interview (on October 15), or perhaps a couple of days after that. In any event, Anderson charged Ortiz with tampering with the cuff port on his cell door. In truth, Ortiz says, the cuff port was faulty and Anderson knew it was faulty because she submitted a maintenance work order in that regard. And although Ortiz shared his cell with Cruz, Anderson charged only Ortiz with that violation.

Following his T.R.O. interview, Ortiz was sent to the "Severe Management Unit" (SMU) for twenty-two days, where he was only allowed out of his cell three times per week, for fifteen minutes each. *Id.* at 162, ¶ 21. Ortiz says he's never known another inmate to be transferred out of his housing unit for an out-of-bounds

5

infraction, and he is the only one of the three charged with that infraction who was transferred. But Cruz, whose declaration Ortiz submitted in opposition to summary judgment, says he was also transferred to the SMU after his T.R.O. interview.

On October 30, Ortiz attempted hang himself in his SMU cell, or at least was discovered with noose in hand (the record is ambiguous). Prison officials transferred him to the main infirmary in Draper, Utah, for about a week, and then transferred him back to the Gunnison facility. After his return, he was given a stricter security classification and housed in a maximum-security unit. For a few days he lost numerous privileges, such as phone calls, visits, and his property. By November 9, however, he returned to the general population and received his property again.

At some unspecified time during all of this, a prison disciplinary officer acquitted Ortiz of the cuff port charge. No party points to anything in the record about the ultimate disposition of the out-of-bounds charge.

### C. Ortiz's Grievance

On October 21, 2015—after his transfer to the SMU but before his suicide attempt—Ortiz submitted a grievance. He began by stating, "I am being [harassed] and retaliated against for having written a griev[a]nce and also for wanting to write one on Sgt. Anderson." R. vol. II at 99. He noted he had previously grieved harassment by (unnamed) prison officers, and he had grieved the A/B schedule. He then said, "After writing these griev[a]nces," and proceeded to narrate the July 29 assault. *Id.* at 100. At the end of that narrative, Ortiz opined that "[t]his was no 'accident' or 'mistake', why wasn't procedure followed? [A]nd how did those guys

6

know I was in O.M.R[.] and [how were they] allowed out of their section to wait for me? I now believe this was done on purpose to retaliate on me." *Id.*

Ortiz then recounted that the July 29 assault prompted him to write a grievance "to get off the A-B schedule." *Id.* Ortiz said he was "told by Lt. Peterson when he handled my griev[a]nce that I 'had put a huge spotlight on me' and that, 'it would go all bad for me if I p[u]rsue it.' ([Referring] to my griev[a]nce[.])" *Id.* So, he continued, "I am now writing this griev[a]nce for retaliation based on the incidents which I have stated here. . . . Clearly this is all retaliation." *Id.*

Prison officers denied relief to Ortiz at all three levels of the Utah prison system's grievance process, essentially concluding that Ortiz had not presented enough evidence to show that his treatment after the out-of-bounds incident was retaliatory.

## III.  PROCEDURAL HISTORY

Ortiz filed a 42 U.S.C. § 1983 lawsuit in the United States District Court for the District of Utah in April 2017. He variously accused defendants of deliberate indifference toward the threat of assault (failure to protect), deliberate indifference toward the injuries caused by that assault (inadequate medical care), and retaliating against him for grieving the assault.

The district court screened the complaint, allowed most of it to go forward, and ordered the U.S. Marshals Service to serve process on defendants. In the same order, the district court ordered defendants to file a *Martinez* report within 90 days of

7

answering the complaint, and a summary judgment motion 30 days after that.[3] The

order went on to state that "Plaintiff may file a response [to the *Martinez* report]

within 30 days of the report's filing date," and he "must submit a response [to any

summary judgment motion] within 30 days of the motion's filing date." Supp. R.

at 14.

While defendants prepared their *Martinez* report, Ortiz began serving

interrogatories, requests for admission, and requests for production of documents.

This prompted defendants to file a "notice of non-response to continued requests for

discovery." *Id.* at 30 (capitalization normalized). Defendants stated that, "[o]ften,

relevant documents are produced as part of the *Martinez* Report," so they "should be

allowed to file their *Martinez* Report prior to any production of records directly to the

Plaintiff." *Id.* at 31. Defendants said nothing specifically about interrogatories or

requests for admission but pointed the court to a ruling (from a different case and

judge, but within the same district) postponing discovery until after the *Martinez*

report. "Thus," defendants concluded, "Plaintiff's repeated requests [for] discovery

are premature and Defendants will prepare a *Martinez* Report addressing Plaintiff's

claims." *Id.*

---

[3] A *Martinez* report is a procedure first approved in *Martinez v. Aaron*, 570 F.2d 317, 319 (10th Cir. 1978). As explained in later cases, the district court may "direct prison officials to respond in writing to the [prisoner's] various allegations, supporting their response by affidavits and copies of internal disciplinary rules and reports. The purpose of the *Martinez* report is to ascertain whether there is a factual as well as a legal basis for the prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). We discuss *Martinez* reports in greater detail below (Part IV).

Defendants' notice prompted Ortiz to file a motion to compel discovery. Ortiz attached copies of (apparently) all his outstanding discovery requests.

Defendants never responded to the motion to compel. About two weeks later, however, defendants filed their *Martinez* report—nearly all of it under seal because they had marked nearly all of it as private under Utah public records laws. Defendants' report comprised their declarations prepared specifically for the report, the prison's contemporaneous internal report on the incident in which Ortiz was assaulted, Ortiz's grievance records, Ortiz's medical records, and the prison's grievance policy.

With defendants' summary judgment deadline in mind (thirty days after the *Martinez* report), Ortiz wrote to the court "to inquire about some motions that . . . have not yet been decided. I really need these motions to be looked at by the judge so I can proceed with this case and appropriately respond to Defendants['] Motion for Summary Judgement." *Id.* at 161. Among the motions Ortiz listed was his motion to compel discovery.

Defendants filed their summary judgment motion a few weeks later. Defendants' statement of undisputed material facts, as required by DUCivR 56-1(b)(3), cited portions of the *Martinez* report for support. Defendants argued that Ortiz did not exhaust his failure-to-protect claim, and, alternatively, the claim failed on its merits. Defendants further argued that Ortiz's medical-care and retaliation claims failed on their respective merits.

Ortiz responded to the summary judgment motion and disputed many of

9

defendants' allegedly undisputed facts.  He also attached declarations from himself

and fellow prisoners.  He further argued that he expected he could provide more

evidence if defendants were required to answer the discovery requests at issue in his

still-pending motion to compel.  And he attached to his response brief a document he

titled "Letter Under Oath," which he signed under penalty of perjury.  R. vol. I at

154, 155.  In that letter, he cited his motion to compel and asserted that he could not

adequately dispute summary judgment on the failure-to-protect and retaliation claims

without obtaining the requested discovery.

The district court granted defendants' summary judgment motion in full.  *See*

*Ortiz v. Torgensen*, No. 2:17-CV-328 TC, 2019 WL 1376837 (D. Utah Mar. 27,

2019).[4]  Regarding failure-to-protect, the district court found that Ortiz had not

exhausted his claim.  Regarding medical care, the district court found that the

evidence showed only a dispute over the appropriate type of treatment, not a lack of

treatment or interference with treatment.  And regarding retaliation, the district court

found that Ortiz had presented some evidence of retaliatory motive, but not enough to

prove that such a motive was the but-for cause of the allegedly retaliatory actions.

Throughout its summary judgment order, the district court treated the *Martinez*

report as undisputed to the extent Ortiz did not directly refute it.  This is true even as

to portions of the *Martinez* report never cited by defendants in their statement of

---

[4] The district court's caption identifies the first named defendant as "Torgensen."  The record shows that "Torgenson" is the correct spelling.  *See* R. vol. I at 19; R. vol. II at 89.

10

undisputed facts.

At the end of the summary judgment order, the district court denied Ortiz's motion to compel discovery because "[t]he subsequent *Martinez* report process rendered this request unnecessary." *Id.* at \*15. The district court said nothing about the Letter Under Oath.

## IV.    DISCOVERY

Ortiz argues on appeal that the district court erred in denying his discovery requests. This argument potentially affects all of Ortiz's merits arguments. Whether Ortiz demonstrated a genuine issue of material fact turns, in part, on whether he had a fair chance to develop necessary evidence. So we address the discovery question first.

Defendants say that "Ortiz's motion to compel was premature. It was filed before discovery even began." Answer Br. at 17. But Federal Rule of Civil Procedure 26(d)(1) says, "A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B) . . . ." And Rule 26(a)(1)(B)(iv) says that "an action brought without an attorney by a person in the custody of the United States, a state, or a state subdivision" is exempt from initial disclosures. Thus, Rule 26 did not require Ortiz to wait until the normal opening of discovery. Regardless, defendants point to no local rule nor any order in the record (and we could find none) forbidding discovery ahead of the *Martinez* report.

Defendants go on to say that Ortiz's motion to compel "might not have been

11

patently frivolous if he had filed it after the *Martinez* report was filed, and if he had specified to the district court exactly what items of additional evidence would have legitimately helped him prove his case." Answer Br. at 17–18. But the district court never ruled that Ortiz's motion, or any discovery request, was patently frivolous. Nor did the district court order that he re-file it with greater specificity after the *Martinez* report. In any event, Ortiz filed a request shortly after receiving the *Martinez* report, asking the district court to rule on his still-outstanding motion to compel so he could prepare for summary judgment. The district court did not act on that request and did not act on the motion to compel until its summary judgment order.

Finally, defendants argue that "Ortiz should have raised any legitimate discovery concerns back when the district court was still considering the motion for summary judgment." *Id.* at 18. But he did:

- His motion to compel was still pending, and he had specifically requested a ruling on it before summary judgment.

- He asserted in his summary judgment response that he could provide better evidence if defendants would comply with his discovery requests.

- He attached his Letter Under Oath to his response brief stating that, at least with respect to his failure-to-protect and retaliation claims, he did not have the evidence he needed because defendants refused to answer

12

his discovery requests.[5]

In short, defendants' arguments are unpersuasive. They assume procedural restrictions that the district court never imposed and they ignore relevant portions of the record.

The district court gave only one reason for denying the motion to compel: "The subsequent *Martinez* report process rendered this request unnecessary." *Ortiz*, 2019 WL 1376837, at *15. We have reviewed Ortiz's discovery requests. The *Martinez* report addresses many of them, but not all. The remaining discovery requests are still arguably "relevant to any party's claim or defense" and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). If the district court had addressed them directly, we cannot say on this record that its discretion would have been wide enough to deny all of them.

The district court's reliance on the *Martinez* report in lieu of compelling discovery was problematic from another perspective. The district court treated the report as undisputed, whether or not defendants cited it in their summary judgment brief. But a district court may not use a *Martinez* report to "resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). And "[a] bona fide factual dispute exists even when the plaintiff's factual allegations

---

[5] Federal Rule of Civil Procedure 56(d) allows summary judgment nonmovants to make this kind of request. Neither defendants nor the district court acknowledged his Letter Under Oath, much less argued or ruled, respectively, that it was not a proper Rule 56(d) request.

13

that are in conflict with the *Martinez* report are less specific or well-documented than those contained in the report." *Id.*

We have allowed *Martinez* reports to be used for their truth against a plaintiff if the plaintiff has been warned that failing to respond to the *Martinez* report could lead to that result. *See Schlicher v. Thomas*, 111 F.3d 777, 780 (10th Cir. 1997). Ortiz received no such warning here. He was told he "*may* file a response" to the *Martinez* report, but the only thing to which the district court said he "*must* submit a response" was defendants' summary judgment motion. Supp R. at 14 (emphasis added).

Moreover, Ortiz would have had difficulty preparing a meaningful response to this particular *Martinez* report. Defendants' report was not a "report" in the sense of synthesizing the evidence and presenting defendants' position on what happened. Instead, it was a collection of individual declarations, contemporaneous accounts, and pages upon pages of grievance and medical records. Yet it seems the district court expected Ortiz to respond to every paragraph of every declaration and every sentence of every other document. We need not decide whether a district court may fairly require such a response. Even if it may, the district court did not provide notice that it expected as much.

For all these reasons, we find the district court abused its discretion when it denied Ortiz's motion to compel. But we "must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Thus, the question for us now is harmlessness—would Ortiz's requested discovery have changed

14

anything?  We address that question in the context of the two claims he specifically addressed in his Letter Under Oath: failure to protect and retaliation.

## V.     FAILURE TO PROTECT

Before bringing a civil rights lawsuit regarding prison conditions, prisoners must exhaust available administrative remedies.  *See* 42 U.S.C. § 1997e(a).  "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined . . . by the prison grievance process itself."  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citation and internal quotation marks omitted).

Utah prison regulations require inmates to file grievances within seven working days of the grievable event.  The earliest grievance in the record is dated October 21, well over seven days after the July 29 assault.  But that October 21 grievance summarizes a previous grievance about the assault.  And, in a summary judgment declaration, Ortiz added that:

- he grieved the assault on August 6 (within seven working days of July 29);

- the meeting where Peterson threatened him if he continued to pursue the grievance took place on August 13; and

- based on Peterson's threats, Ortiz felt "compelled to circle the 'yes' part of the grievance resolve form."

R. vol. I at 85, ¶ 10.

The district court did not accept this account, essentially finding Ortiz not

credible on the question of whether he submitted an August 6 grievance. District courts may not judge credibility at summary judgment, *see Anderson*, 477 U.S. at 255, but Ortiz does not challenge this part of the district court's reasoning. Nor, importantly, does he argue that his discovery requests would have caused defendants to produce the August 6 grievance if the district court had granted his motion to compel.

Instead, Ortiz argues that his October 21 grievance:

- was enough to preserve the failure-to-protect issue arising on July 29, and

- should be deemed timely because Peterson's threats "hinder[ed] him from p[u]rsuing a grievance" and created a "reluctance to grieve the matter until he was transferred to a different location" (*i.e.*, the transfer to the SMU after the out-of-bounds incident).

Aplt. Opening Br. at 9. In other words, Ortiz continues to claim that Peterson intimidated him, but he no longer argues that his alleged August 6 grievance is relevant to his failure-to-protect claim. He has not abandoned his assertion that he filed an August 6 grievance related in *some* way to the July 29 attack (as will become clear in our discussion of retaliation, below). But he no longer argues that the August 6 grievance is relevant to whether he exhausted his failure-to-protect claim. He instead stakes his entire argument on the October 21 grievance. Thus, for purposes of his failure-to-protect claim, we focus on that grievance.

We will assume for argument's sake that Peterson indeed intimidated Ortiz out

16

of filing (or further pursuing) a timely grievance of the July 29 assault. We will further assume that Ortiz did not feel safe filing a new grievance until he was transferred to a different housing unit—the SMU—where he was no longer under Peterson's supervision. Even under these assumptions, we must affirm the district court's conclusion that Ortiz failed to exhaust his remedies as to the July 29 assault.

Ortiz's October 21 grievance describes the July 29 assault as factual context for his belief that Peterson (and Anderson, the housing sergeant) were motivated to retaliate against him. Indeed, Ortiz describes the July 29 assault itself as a set-up, meant as retaliation for previous unspecified grievances. In his own words, "Clearly this is all retaliation." R. vol. II at 100.

Utah prison regulations require the inmate to "identify[] the specific nature of the grievance." R. vol. I at 53 (regulation FD02/02.06(A)(1)). We fail to see how prison officials could have understood the "specific nature" of the October 21 grievance to be anything but retaliation, and only retaliation.

Ortiz highlights the Ninth Circuit's statement that prison grievances "need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved. . . . The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009). Even under this standard, Ortiz's October 21 grievance did not alert Utah prison officials to a failure-to-protect problem.

For this reason, we affirm the district court's finding that Ortiz failed to

17

exhaust his administrative remedies as to his failure-to-protect claim.

## VI.   RETALIATION FOR FILING GRIEVANCES

As recounted above (Part II.B), Ortiz says he received unusually harsh discipline for an out-of-bounds charge arising on October 10, 2015. Ortiz believes Anderson and Peterson imposed more severe discipline than they normally would have because they wanted to punish him for his grievances, and particularly for complaining about the July 29 incident.

It is well-settled that "prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts." *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (internal quotation marks omitted). "This principle applies even where the action taken in retaliation would be otherwise permissible." *Smith v. Maschner*, 899 F.2d 940, 948 (10th Cir. 1990). A prisoner claiming retaliation must "allege specific facts showing retaliation [on account] of the exercise of the prisoner's constitutional rights," *Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990), and he "must prove that 'but for' the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place," *Smith*, 899 F.2d at 949–50.

The district court focused on the but-for element. It acknowledged Ortiz's evidence (*e.g.*, what Peterson and Anderson allegedly said to Ortiz about his grievances) but weighed it against defendants' explanation that he was moved to the SMU for going out of bounds. The court also noted that his subsequent housing moves were due to his suicide attempt. The district court thus reasoned that Ortiz

18

"may . . . have shown that retaliation for filing grievances played a role in moving [him] to more restrictive housing but he failed to show that such retaliation was the decisive factor." *Ortiz*, 2019 WL 1376837, at \*10 (internal quotation marks omitted).

We presume the district court meant to say that Ortiz had not presented enough evidence from which a reasonable jury could conclude that retaliation was "the decisive factor." Even under that presumption, we disagree.

Defendants' summary judgment argument regarding retaliation appears to have been an afterthought. Notably, defendants' itemized assertions of material fact (which Ortiz was required to specifically admit or deny) said nothing about the out-of-bounds incident. The out-of-bounds incident only came up in the argument section, and only as a simple denial and brief counter-explanation: "Ortiz claims he was retaliatorily moved out of [his unit] by Lt. Peterson on October 10, 2015. But this is not true. Ortiz was moved because he went out of bounds." R. vol. I at 128 (citation omitted). In support, defendants cited an unsigned November 2015 memorandum from "Birch OMR" to "Grievance Coordinator" providing (apparently) the prison officials' side of the story. R. vol. II at 111.

Thus, defendants presented barely any argument for summary judgment on the out-of-bounds incident. Yet the district court's opinion sets forth twelve bullet-pointed "Undisputed Material Facts" regarding the incident (some of them several sentences long), followed by seven substantial paragraphs of analysis. *See Ortiz*, 2019 WL 1376837, at \*8–11.

19

We recognize that the special difficulties of conducting a pro se prisoner trial frequently counsel in favor of double- or triple-checking whether a genuine issue of material fact exists, even if it means going beyond the parties' arguments. Moreover, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

But especially in these circumstances, the district court must also double- and triple-check that it is following the standards governing summary judgment. We have reviewed the district court's enumeration of supposedly undisputed facts and we conclude that certain material facts are genuinely disputed.

First, the district court accepted the above-mentioned "Birch OMR" memo as undisputed, apparently because it was part of the *Martinez* report and Ortiz never explicitly denied it. This anonymous memo asserts that "[d]ue to the nature of the incident and issues with active gang members it was decided to place the out of bounds inmates on TRO for safety and security of the institution." R. vol. II at 111. Ortiz's evidence, although partly circumstantial, raises a genuine dispute about this explanation, even if Ortiz did not specifically identify and refute the memo.

Second, the district court treated another *Martinez* report document—a February 2016 narrative written by Peterson, responding to a later grievance—as undisputed. The later grievance, which we could not locate in the record, apparently re-raised Ortiz's move to the SMU after his T.R.O. interview. Peterson wrote in

20

response, "The reason [Ortiz] was moved from Birch is he has stated in previous grievances he was afraid of Birch Staff retaliating against him." *Id.* at 130. The district court relied on this as evidence undermining but-for causation. But Peterson's letter does not identify these "previous grievances," and the earliest grievance in the record expressing fear about staff retaliation was the October 21 grievance, written six days *after* Ortiz's T.R.O. interview and transfer to the SMU. Thus, Peterson's explanation is impeachable and should not have been deemed undisputed—and then used against Ortiz—at summary judgment.

More generally, the district court approached Ortiz's retaliation claim as if he bore the burden to prove that every assertion in support of his claim created a genuine dispute of material fact. We recognize that Ortiz attributes a retaliatory motive to essentially everything that happened to him for a few months after the out-of-bounds incident, but inability to raise a genuine issue for trial about *all* of it does not necessarily mean he fails to raise a genuine issue about *any* of it.

As we read Ortiz's claim, the basic question is whether Anderson or Peterson, or both, imposed an allegedly harsher punishment than normal for an out-of-bounds charge—*i.e.*, T.R.O. lockdown and then transfer to the SMU—because they wanted to punish Ortiz for filing grievances. As to that, the evidence in the light most favorable to Ortiz is as follows:

- in August, Peterson threatened Ortiz with bad consequences if he continued the grievance process regarding the July 29 assault;

- following the out-of-bounds incident in October, Ortiz and Cruz were

21

sent directly to T.R.O. lockdown—a harsher punishment than what they had observed from previous out-of-bounds incidents;

- at Ortiz's T.R.O. interview, Peterson complained that Ortiz's grievance following the July 29 assault had gotten him in trouble and had gotten a senior supervisor transferred;

- at the same interview, Anderson criticized Ortiz regarding his grievances and told Ortiz she did not want him in her housing unit;

- at Cruz's T.R.O. interview, Peterson accused Ortiz of being a snitch;

- Anderson additionally charged Ortiz with cuff port tampering, despite knowing that the cuff port was faulty—and Ortiz was eventually acquitted of the charge;

- following their T.R.O. interviews, Ortiz and Cruz were sent to the SMU—a significantly harsher punishment compared to previous out-of-bounds punishments they had observed; and

- Peterson and Anderson submitted nothing in the *Martinez* report or at summary judgment denying, or even providing context for, any of the foregoing.[6]

On Anderson's and Peterson's side of the ledger, we note that:

- Ortiz did *not* pursue his grievance of the July 29 assault, so, even under his story, they had less of a motive to retaliate two months later; and

---

[6] Anderson's *Martinez* report declaration—but, notably, not Peterson's—denies calling Ortiz a snitch. *See* R. vol. III at 27, ¶ 8.

22

- they treated Ortiz and Cruz equally (apart from the cuff port tampering charge), thus undermining the inference that they were singling out Ortiz based on his grievances.

On balance, however, we believe that a reasonable jury could still find that, but for a desire to punish Ortiz for his grievances, Peterson and Anderson would not have disciplined him as harshly.[7]

This assumes, of course, that Peterson or Anderson (or both) caused Ortiz to be placed in T.R.O. lockdown or sent to the SMU (or both). *See Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1156–57 (10th Cir. 2001) (holding that § 1983 plaintiff must allege and prove each defendant's liability for the constitutional deprivation). They say nothing about this in the *Martinez* report, yet Ortiz specifically inquired in his discovery requests about their involvement in these decisions. Ortiz also asked for other information that might support his but-for case, such as maintenance records relating to the cuff port and historical records about the type of discipline imposed for out-of-bounds charges.

We must therefore vacate summary judgment on Ortiz's retaliation claim against Anderson and Peterson and remand for further proceedings. We will not dictate what those proceedings should look like, other than to say that Ortiz must

---

[7] A retaliation plaintiff must also prove that "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). Defendants have never argued, here or below, that the conditions of confinement in T.R.O. lockdown or the SMU fail to meet this standard.

receive a fair opportunity to seek discovery regarding retaliation under the same standards that apply to discovery in any other case. Thus, the district court might reopen discovery on retaliation generally, or it might revisit the motion to compel and require Ortiz to specify which of his discovery requests he still wishes to enforce. There may be other possibilities that we have not considered but that would be within the district court's discretion. And, concerning the discovery requests we have specifically mentioned above, we cannot say on this record that the district court would necessarily abuse its discretion if it looked at those requests on their merits and then refused to compel defendants' response. But we likewise cannot say on this record that it was harmless to relieve defendants of that burden merely because they produced a *Martinez* report.

For these reasons, we vacate and remand on the retaliation claim against Anderson and Peterson and connected discovery issues.[8]

## VII. FAILURE TO PROVIDE ADEQUATE MEDICAL CARE

### A. Additional Background

Immediately after the July 29 attack, prison staff escorted Ortiz to the medical

---

[8] Ortiz also sued defendant "Ekkart" (actually Tanya Ekker, *see* R. vol. II at 48) for allegedly opening and reading his legal mail and discussing its contents with other defendants, all with intent to retaliate against Ortiz for filing grievances. Ortiz did not allege that this was connected to the out-of-bounds incident. The district court granted summary judgment to Ekker because Ortiz had not "give[n] the slightest hint that she had any way to even know about his history of grievances . . . , let alone retaliate against him for them." *Ortiz*, 2019 WL 1376837, at *7. Ortiz does not challenge this reasoning on appeal and has therefore abandoned his claim against Ekker.

clinic.  He reported "severe" pain in his jaw, neck, and a finger on his right hand.  R. vol. I at 157, ¶ 1.  The medical staff relayed Ortiz's condition to defendant Burnham, a physician employed by the prison, who was apparently not on-site that day.  Burnham prescribed ibuprofen (800 mg).

The next day (July 30, 2015), Ortiz submitted a medical care request, complaining of continuing pain in his jaw, neck, and finger.  On July 31, 2015, defendant Dennis, a physician's assistant, examined Ortiz.  Ortiz complained only of jaw pain during that examination.  Dennis saw no evidence of a fracture but prescribed three days of ibuprofen (800 mg) and liquid meals (so Ortiz would not need to chew) and ordered an x-ray of the jaw.

Later the same day, Dennis heard through a nurse that Ortiz was complaining of right hand pain too, so Dennis authorized an x-ray of that hand.  Unnamed prison medical staff then attempted to perform the x-ray on Ortiz's hand, but the equipment was not working properly.

Ortiz submitted another medical care request on August 5.  The next day, he received the hand x-ray, which, according to the radiologist, revealed an "[a]ge indetermina[te]" displacement injury and a "prior fracture," but "[n]o acute fracture." R. vol. II at 326.

Dennis saw Ortiz again the day after that (August 7).  Ortiz complained of significant jaw pain but Dennis believed Ortiz was exaggerating.  Dennis nonetheless continued Ortiz's liquid meal prescription for another week.

Ortiz again complained of hand/finger pain on September 27, and Dennis saw

Ortiz on September 30. Dennis noticed minor swelling, ordered x-rays again (which revealed nothing new), and prescribed naproxen (500 mg) and physical therapy. That was the last time Dennis saw Ortiz for a medical complaint relevant to this lawsuit.

In October and November 2015, Ortiz was scheduled for six physical therapy appointments. He missed four of those appointments due to circumstances out of his control. After the last missed appointment, the physical therapist (not a defendant here) decided not to reschedule due to missed appointments.[9]

In March 2016, Ortiz requested medical care for pain in his neck and continuing problems with his finger (he could not bend it fully). Burnham—the physician who prescribed ibuprofen on the day of the assault the previous summer— saw Ortiz and ordered an MRI of his neck. Burnham turned down Ortiz's request for additional physical therapy.

Ortiz received the MRI but Burnham did not afterwards follow up. Ortiz submitted another medical request in May 2017 and Burnham examined him again. Burnham gave Ortiz a cervical pillow, but also told Ortiz "he would do nothing more for [his] neck." R. vol. I at 160, ¶ 15. Ortiz still lacks full mobility in his neck.

**B.    Analysis**

"[T]o state a cognizable claim [for an Eighth Amendment violation due to

---

[9] Defendants Sorenson and Sylvester were the prison guards who would have transported Ortiz to the appointments he missed. The district court granted summary judgment in their favor on Ortiz's claim that they interfered with his medical care. Ortiz does not argue on appeal that this was error, so he has abandoned his claim against Sorenson and Sylvester.

inadequate medical care], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This standard

> involves both an objective and a subjective component. The objective component is met if . . . [the medical need] has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety.

*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks and citations omitted).

But "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Thus, "where a doctor merely exercises his considered medical judgment," the plaintiff must show "an extraordinary degree of neglect." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). "Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Id.*

As the district court accurately noted, Burnham and Dennis treated Ortiz every time he asked, and they always prescribed some sort of medicine, diagnostic test, therapy, or other treatment. Ortiz therefore must show that Burnham's treatment or Dennis's treatment (or both) displayed "an extraordinary degree of neglect." *Id.* He has not presented evidence from which a reasonable jury could reach that conclusion.

27

He instead asserts, without specifics, that they should have done more. But "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). We therefore affirm the district court's grant of summary judgment in favor of Burnham and Dennis.

## VIII. SEALED PORTIONS OF THE RECORD

As noted previously, defendants filed most of the *Martinez* report under seal. When this court prepared the record on appeal, *see* 10th Cir. R. 10.3(C) (providing that the court prepares the record in pro se cases), the court maintained the seal but ordered defendants to explain why those records were appropriately sealed. After receiving defendants' response, the clerk's office referred the ultimate resolution to this panel.

We may not seal the record unless there is "some significant interest that outweighs the presumption in favor of open access to judicial records." *United States v. Pickard*, 733 F.3d 1297, 1300 (10th Cir. 2013) (internal quotation marks omitted). Defendants say that most of the *Martinez* report documents are "classified as private, protected, or controlled records under Utah Code Ann. § 63G-2-304, and, as such, should not be disclosed to the public." Aplee. Response re: Sealed Record (Resp.) at 1–2 (Mar. 13, 2020). Assuming this state law should govern a federal court's decision whether to seal, the cited statute applies to "medical, psychiatric, or psychological data about an individual." Utah Code Ann. § 63G-2-304(1). Parts of the *Martinez* report fit this description, but not all of it.

28

Defendants further say that the *Martinez* report should remain sealed "to maintain the institutional safety and control of the prison." Resp. at 2. But they do not explain how prison safety would be affected by unsealing the report. Apart from the medical records, the report comprises declarations from defendants gathered for purposes of the report itself, contemporaneous institutional reports about the July 29 attack, and Ortiz's grievance file from October 2015 through May 2016. Records such as these are routinely disclosed without restriction in prisoner litigation.

We further note that the *Martinez* report procedure is a court-ordered mechanism to assist the court in evaluating the merits of the case. It places trust in prison officials to fairly and thoroughly develop the relevant facts. The public has a strong interest in seeing for itself what prison officials produce.

We conclude that only Ortiz's medical records should remain under seal. Accordingly, we order the clerk to

- file an unsealed version of volume II, minus pages 164–355 (Ortiz's medical records); and

- unseal volume III of the record, which contains no medical records.

## IX.  CONCLUSION

We affirm the district court's judgment as to Ortiz's failure-to-protect claim, denial-of-medical-care claim, and retaliation claim as it relates to defendant Ekker. We vacate the judgment as to Ortiz's retaliation claim as it relates to defendants Anderson and Peterson. We also vacate the district court's denial of his motion to compel discovery. We remand for proceedings consistent with this opinion. Finally,

29

we deny Ortiz's motion to appoint appellate counsel.

Entered for the Court


Gregory A. Phillips
Circuit Judge